No. 25-6068

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

CALIFORNIA APARTMENT ASSOCIATION et al.
Plaintiffs-Appellants,

v.

COUNTY OF ALAMEDA et al.
Defendants-Appellees.

---

Appeal from the United States District Court
for the Northern District of California
Case No. 3:22-cv-01274-LB

---

## COUNTY DEFENDANTS' ANSWERING BRIEF

---

Matthew D. Zinn
Mindy K. Jian
Chloe S. Lew
Shute, Mihaly & Weinberger LLP
550 California Street, Suite 1200
San Francisco, California 94104
Telephone: (415) 552-7272
Facsimile: (415) 552-5816

Attorneys for Defendants-Appellees County of Alameda and Board of
Supervisors of the County of Alameda

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ 4

INTRODUCTION .................................................................................... 11

ISSUES PRESENTED ............................................................................. 13

JURISDICTIONAL STATEMENT ........................................................... 14

STATEMENT OF THE CASE .................................................................. 14

    I.    State and local governments respond to the global
        COVID-19 pandemic. .......................................................... 14

    II.   The County enacts a temporary eviction moratorium to
        mitigate the pandemic's impacts. ....................................... 15

    III.  CAA challenged the Moratorium, and the district court
        repeatedly rejected their claims........................................... 17

STANDARD OF REVIEW........................................................................ 20

SUMMARY OF ARGUMENT ................................................................... 20

ARGUMENT ........................................................................................... 25

    I.    Per se takings occur only in an extreme case where
        regulation compels a landowner to allow physical
        occupation by a stranger. The vast majority of
        challenges are governed by *Penn Central*............................ 25

    II.   The Moratorium regulated preexisting landlord-tenant
        relationships and thus did not cause a physical taking....... 27

        A.   This Court and many others have applied *Yee* to
            COVID-19 eviction moratoria and refused to find
            them to be physical takings. ...................................... 27

        B.   The Moratorium was a permissible limitation on
            "the right to exclude." *Cedar Point* is inapposite
            because it applies only where a regulation grants
            access to strangers. ..................................................... 34

        C.   CAA's position would imperil legitimate rent
            control.......................................................................... 37

III.    All three *Penn Central* factors weigh against finding a taking.................................................................38

    A.    CAA's *Penn Central* claims fail because they did not allege the severe impact to property value that this Court's precedent demands. .........................39

        1.    CAA cannot show economic impact based on operating losses....................................................41

        2.    The district court correctly declined to be the first court to recognize a *Penn Central* taking where the plaintiff's property retained the majority of its value. .....................44

    B.    CAA's failure to allege severe economic impact is fatal to their claims, but the remaining *Penn Central* factors also weigh against finding a taking. ...............................................................47

        1.    The Moratorium did not interfere with reasonable investment-backed expectations because it was limited in scope, temporary, and consistent with past emergency housing regulations. .......................................................48

        2.    The Moratorium was a permissible adjustment of economic burdens; the character factor weighs against finding a taking. ...............................................................51

IV.    The district court correctly dismissed CAA's Contracts Clause claim. ........................................................53

    A.    The Moratorium did not substantially impair CAA's leases because it was a temporary restriction on only one remedy for breaches. ..............54

    B.    The Moratorium reasonably advanced legitimate public health and housing stability objectives during a global pandemic.............................................59

CONCLUSION ..............................................................................64

Form 8. Certificate of Compliance for Briefs.........................................66

3

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*238 Serrano Props. LLC v. California*,
No. 2:24-cv-08443-SSS-SSCx, 2025 WL 2946988
(C.D. Cal. Sep. 22, 2025) ............................................. 28, 29, 43, 61

*Allied Structural Steel Co. v. Spannaus*,
438 U.S. 234 (1978) ....................................................................... 53

*Apt. Ass'n of Los Angeles Cnty., Inc. v. City of Los Angeles*,
10 F.4th 905 (9th Cir. 2021) ................................................... passim

*Ashcroft v. Iqbal*,
556 U.S 662 (2009) .................................................................. 46, 57

*Auracle Homes, LLC v. Lamont*,
478 F. Supp. 3d 199 (D. Conn. 2020) ...................................... 28, 55

*Ballinger v. City of Oakland*,
24 F.4th 1287 (9th Cir. 2022) ..................................... 29, 30, 37, 56

*Baptiste v. Kennealy*,
490 F. Supp. 3d 353 (D. Mass. 2020) ...................................... 28, 59

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....................................................................... 46

*Block v. Hirsh*,
256 U.S. 135 (1921) ..................................................... 22, 37, 49, 56

*Bordelon v. Baldwin County*,
No. CA 20-0057-C, 2022 WL 16543269
(S.D. Ala. Oct. 28, 2022) ............................................................... 44

*Bridge Aina Le'a, LLC v. Land Use Commission*,
950 F.3d 610 (9th Cir. 2020) ........................................... 43, 46, 48

*CCA Assocs. v. United States*,
667 F.3d 1239 (Fed. Cir. 2011) .............................................. 45, 47

*Cedar Point Nursery v. Hassid*,
594 U.S. 139 (2021) ............................................................... passim

4

*Cmty. Housing Improvement Prog. v. City of New York*,
    59 F.4th 540 (2nd Cir. 2023) ................................................28

*Colony Cove Properties, LLC v. City of Carson*,
    888 F.3d 445 (9th Cir. 2018) ................................................ passim

*Darby Development Company, Inc. v. United States*,
    112 F.4th 1017 (Fed. Cir. 2024) .............................................35, 36

*David Hill Dev., LLC v. City of Forest Grove*,
    No. 3:08-cv-266-AC, 2012 WL 5381555 (D. Or. Oct. 30, 2012)......44

*El Papel LLC v. Durkan*,
    No. 2:20-cv-01323-RAJ-JRC, 2021 WL 4272323
    (W.D. Wash. Sep. 15, 2021)................................................ 15, 30, 61

*El Papel, LLC v. City of Seattle*,
    No. 22-35656, 2023 WL 7040314 (9th Cir. Oct. 26, 2023)..... passim

*Elmsford Apt. Assocs., LLC v. Cuomo*,
    469 F. Supp. 3d 148 (S.D.N.Y. 2020) ...............................28, 49, 55

*Energy Reserves Group, Inc. v. Kan. Power & Light Co.*,
    459 U.S. 400 (1983) .........................................................55, 59, 63

*Evans Creek, LLC v. City of Reno*,
    No. 21-16620, 2022 WL 14955145 (9th Cir. Oct. 26, 2022).... 40, 42,
    46, 47

*Farhoud v. Brown*,
    No. 3:20-cv-2226-JR, 2022 WL 326092 (D. Or. Feb. 3, 2022)........28

*FCC v. Fla. Power Corp.*,
    480 U.S. 245 (1987) .........................................................26, 29

*Gallo v. District of Columbia*,
    610 F. Supp. 3d 73 (D.C. Cir. 2022).........................................32

*Gallo v. District of Columbia*,
    No. 1:21-cv-03298 (TNM), 2023 WL 7552703
    (D.D.C. Nov. 14, 2023)........................................................28, 55

*GHP Mgmt. Corp. v. City of Los Angeles*,
    No. CV 21-06311 DDP (JEMx), 2022 WL 17069822
    (C.D. Cal. Nov. 17, 2022)....................................................30, 50

*GHP Mgmt. Corp. v. City of Los Angeles*,
    No. 23-55013, 2024 WL 2795190 (9th Cir. May 31, 2024) .... passim

*Guggenheim v. City of Goleta,*
 638 F.3d 1111 (9th Cir. 2010) ......................................................29

*Hall v. City of Santa Barbara,*
 797 F.2d 1493 (9th Cir. 1986) ......................................................33

*Harris v. City of Los Angeles,*
 No. EDCV 24-2679 JGB (SPx), 2025 WL 2300169
 (C.D. Cal. Jul. 31, 2025) ..............................................................28

*Heights Apts., LLC v. Walz,*
 30 F.4th 720 (8th Cir. 2022)..................................................35, 57

*Hendler v. United States,*
 952 F.2d 1364 (Fed. Cir. 1991).....................................................34

*Hodel v. Irving,*
 481 U.S. 704 (1987) ......................................................................47

*Home Bldg. & Loan Ass'n v. Blaisdell,*
 290 U.S. 398 (1934) ................................................................ passim

*Hotop v. City of San Jose,*
 982 F.3d 710 (9th Cir. 2020) ........................................................43

*Kaiser Aetna v. United States,*
 444 U.S. 164 (1979) ......................................................................26

*Keystone Bituminous Coal Ass'n v. DeBenedictis,*
 480 U.S. 470 (1987) ........................................................40, 41, 64

*Lingle v. Chevron U.S.A. Inc.,*
 544 U.S. 528 (2005) ................................................................ passim

*Little Woods Mobile Villa LLC v. City of Petaluma,*
 736 F. Supp. 3d 757 (N.D. Cal. 2024) ..........................................56

*Loretto v. Teleprompter Manhattan CATV Corp.,*
 458 U.S. 419 (1982) ..............................................25, 26, 32, 37

*Lucas v. South Carolina Coastal Council,*
 505 U.S. 1003 (1992) ....................................................................32

*Matsuda v. City & Cnty. of Honolulu,*
 512 F.3d 1148 (9th Cir. 2008) ......................................................53

*McDonald v. Cal. Dep't of Motor Vehicles in Sacramento Cnty.*,
No. 2:21-cv-1561 KJM DB PS, 2022 WL 1460209
(E.D. Cal. May 9, 2022) ................................................................... 49

*MHC Fin. LP v. City of San Rafael*,
714 F.3d 1118 (9th Cir. 2013) .................................... 25, 29, 45, 52

*Nollan v. Cal. Coastal Comm'n*,
438 U.S. 825 (1987) ........................................................................ 26

*Parker v. Fleming*,
329 U.S. 531 (1947) ........................................................................ 37

*Penn Central Transportation Co. v. City of New York*,
438 U.S. 104 (1978) ................................................................ passim

*Pennsylvania Coal Co. v. Mahon*,
260 U.S. 393 (1922) ........................................................................ 25

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*,
494 F.3d 788 (9th Cir. 2007) ......................................................... 20

*Portsmouth Harbor Land & Hotel Co. v. United States*,
260 U.S. 327 (1922) ........................................................................ 26

*PruneYard Shopping Center v. Robins*,
447 U.S. 74 (1980) .................................................................... 26, 35

*PVM Redwood Co. v. United States*,
686 F.2d 1327 (9th Cir. 1982) ....................................................... 43

*Rancho de Calistoga v. City of Calistoga*,
800 F.3d 1083 (9th Cir. 2015) ................................................ passim

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020) .......................................................................... 60

*Ross v. City of Berkeley*,
655 F. Supp. 820 (N.D. Cal. 1987) ................................................ 33

*Russellville Legends, LLC v. United States*,
172 Fed. Cl. 455 (Fed. Cl. 2024) ................................... 43, 45, 46, 47

*S. Cal. Rental Hous. Ass'n v. Cnty. of San Diego*,
550 F. Supp. 3d 853 (S.D. Cal. 2021) ................................ 28, 49, 56

*Saddle Mountain Minerals, LLC v. City of Richland*,
No. 23-34622, 2024 WL 4903280 (9th Cir. Nov. 27, 2024) ............ 42

7

*Seaplane Adventures, LLC v. County of Marin,*
 71 F.4th 724 (9th Cir. 2023)...................................................... 15, 64

*Shanks v. Dressel,*
 540 F.3d 1082 (9th Cir. 2008) ........................................................20

*Stuart Mills Props., LLC v. City of Burbank,*
 No. 2:22-cv-04246-RGK-AGR, 2022 WL 4493573
 (C.D. Cal. Sep. 19, 2022) ...........................................................28

*Sveen v. Melin,*
 584 U.S. 811 (2018) ........................................................ 53, 54, 60

*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning
 Agency,*
 535 U.S. 302 (2002) ..................................................................38

*Tatoma, Inc. v. Newsom,*
 No. 3:21-CV-098-BEN-JLB, 2022 WL 686965
 (S.D. Cal. Mar. 8, 2022)...........................................................61

*TwoRivers v. Lewis,*
 174 F.3d 987 (9th Cir. 1999) ......................................................20

*U.S. Trust Co. of N.Y. v. New Jersey,*
 431 U.S. 1 (1977) ....................................................................55

*United States v. Causby,*
 320 U.S. 256 (1946) ..................................................................26

*Valley Investments-Redwood LLC v. City of Alameda,*
 No. 22-cv-06509-DMR, 2023 WL 2868838
 (N.D. Cal. Apr. 10, 2023)..........................................................58

*W. Union Telegraph Co. v. Hansen & Rowland Corp.,*
 166 F.2d 258 (9th Cir. 1948) ......................................................36

*W.B. Worthen Co. ex rel. Bd. of Commissioners of Street
 Improvement District No. 513 of Little Rock, Arkansas v.
 Kavanaugh,*
 295 U.S. 56 (1935) ...............................................................58, 59

*William C. Haas & Co., Inc. v. City & Cnty. of San Francisco,*
 605 F.2d 1117 (9th Cir. 1979) ....................................................45

*Yee v. City of Escondido,*
 503 U.S. 519 (1992) ..........................................................passim

**CALIFORNIA CASES**

*Birkenfeld v. City of Berkeley*,
  17 Cal. 3d 129 (1976)............................................................37

*Cwynar v. City and County of San Francisco*,
  90 Cal. App. 4th 637 (2001).................................................33

*Davidson v. Quinn*,
  138 Cal. App. 3d Supp. 9 (1982)..........................................36

*Fisher v. City of Berkeley*,
  37 Cal. 3d 644 (1984)...........................................................37

*Hong Sang Market, Inc. v. Peng*,
  20 Cal. App. 5th 474 (2018).................................................32

*Howard v. County of Amador*,
  220 Cal. App. 3d 962 (1990).................................................30

*Lee v. Baca*,
  73 Cal. App. 4th 1116 (1999)...............................................37

*Spinks v. Equity Residential Briarwood Apts.*,
  171 Cal. App. 4th 1004 (2009)............................................36

*Walt v. Superior Court*,
  8 Cal. App. 4th 1667 (1992).................................................57

**U.S. CONSTITUTION**

U.S. Const. art. I, § 10, cl. 1 .................................................53

**CALIFORNIA STATUTES**

Cal. Civ. Code § 1946.2.....................................................50, 56

Cal. Civ. Proc. Code § 1159-1179a .........................................50

Cal. Civ. Proc. Code § 1161 .............................................37, 56

Cal. Civ. Proc. Code § 1174 .............................................37, 56

Cal. Gov't Code §§ 7060 et seq. .......................................16, 32

9

**ALAMEDA COUNTY CODE OF ORDINANCES**

§ 6.120.010 ................................................................................16

§ 6.120.030 ........................................................... passim

§ 6.120.040 ........................................................... passim

§ 6.120.050 ................................................................63

§ 6.120.060 ........................................................ 17, 63

§ 6.120.090 ........................................................... passim

## INTRODUCTION

When COVID-19 arrived in March 2020, the County of Alameda, like many jurisdictions, responded by temporarily suspending most evictions ("Moratorium"). The Moratorium aimed to prevent disease transmission and housing instability during a once-in-a-century public health crisis. It expired automatically in April 2023, after the County Health Officer terminated the local public health emergency.

Plaintiffs California Apartment Association et al. (together, "CAA") challenged the moratorium as an unconstitutional taking. They argue it effected a per se physical taking by preventing them from evicting tenants. But this Court and others have uniformly rejected that theory—and have done so in this very context. The Supreme Court in *Yee v. City of Escondido*, 503 U.S. 519 (1992), made clear that regulations governing landlord-tenant relationships—even those that limit eviction—do not cause physical takings because they do not compel property owners to accept uninvited strangers. CAA voluntarily entered the rental market and invited tenants onto their properties. The Moratorium temporarily adjusted the terms of those commercial relationships by limiting one of CAA's remedies. CAA's theory that any limit on the right to exclude—whatever its duration—triggers physical takings scrutiny threatens a wide swath of landlord-tenant regulation.

CAA also claims a regulatory taking under the multi-factor test from *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978) ("*Penn Central*"). But after multiple attempts, they still did not allege the severe economic impact that *Penn Central* demands. The

11

complaint must show that the moratorium drastically reduced property values—not just that CAA suffered operating losses. This Court held in *Colony Cove Properties, LLC v. City of Carson*, 888 F.3d 445 (9th Cir. 2018) ("*Colony Cove*"), that the economic impact of a regulation must be measured by comparing before-and-after property values and that no court has *ever* found a taking where a property retained more than half its value. Yet CAA alleged no reduction in value for one of their properties, and where they did allege reductions, those reductions were all well below 50 percent. That falls far short of what the law requires.

Although CAA's failure to allege an adequate economic injury is dispositive, the other *Penn Central* factors—reasonable investment-backed expectations and the character of the regulation—also undermine their claim. Emergency housing regulations during public health crises, even an extraordinary pandemic, are hardly beyond expectation, particularly in a heavily-regulated field like landlord-tenant relations. Indeed, the Supreme Court upheld similar moratoria during World War I and the Great Depression. Further, the Moratorium was expressly temporary, preserved tenants' obligation to pay rent, allowed evictions in several circumstances, and left landlords free to pursue other remedies. It was thus a measure adjusting the benefits and burdens of a consensual economic relationship and hardly akin to a physical appropriation of land.

CAA's Contracts Clause claim fails for similar reasons. Temporary delays in pursuing one remedy for breach of a lease do not substantially impair contractual rights, particularly where the parties' *obligations*

remain intact. And this Court's decision in *Apartment Association of Los Angeles County, Inc. v. City of Los Angeles*, 10 F.4th 905 (9th Cir. 2021) ("*AAGLA*"), *cert. denied*, 142 S. Ct. 1699 (2022), forecloses any argument that the Moratorium was not reasonably drawn. Its limits on eviction plainly advanced the undeniably legitimate goal of preventing mass displacement during a health emergency.

The County's temporary eviction moratorium responded to a global pandemic that killed over 2,100 County residents. It was a measured response like many others adopted by local governments around the country. This Court should follow the vast majority of courts that have upheld these measures and affirm the judgment.

## ISSUES PRESENTED

1.    Did the district court correctly hold that the County's temporary limitation on CAA's ability to enforce prompt payment of rent and lease compliance through eviction should be evaluated as a regulation of the landlord-tenant relationship under *Yee v. City of Escondido*, 503 U.S. 519 (1992), rather than under the physical takings doctrine?

2.    Did the district court correctly dismiss CAA's regulatory takings claim in holding that:

a.    Under *Colony Cove Properties, LLC v. City of Carson*, 888 F.3d 445 (9th Cir. 2018), CAA failed to allege facts showing the severe impact to their property values essential to a regulatory takings claim under *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978);

13

       b.     Housing regulations enacted during a public health emergency would foreseeably impact the landlord-tenant relationship; and

       c.     A temporary limitation on landlords' ability to pursue one form of remedy for breaches of lease does not resemble a physical invasion of property?

3.     Did the district court correctly hold that a temporary restriction on landlords' ability to enforce lease compliance through eviction that was enacted to ameliorate the impacts of a local public health emergency does not violate the Contracts Clause?

## JURISDICTIONAL STATEMENT

The County agrees with CAA's statement of jurisdiction.

## STATEMENT OF THE CASE

## I.    State and local governments respond to the global COVID-19 pandemic.

On January 31, 2020, the United States Secretary of Health and Human Services declared a nationwide public health emergency in response to the alarming spread of the novel coronavirus, "COVID-19". *See* 2 Plaintiffs' Excerpts of Record ("ER") 135. On March 4, Governor Newsom declared a state of emergency in California on March 4, 2020. 2-ER-138-42. The County's Health Officer declared a local health emergency six days later. 3-ER-333.

COVID-19 has had widespread health, economic, and social impacts on County residents. Multiple surges of new, more infectious

variants prolonged the pandemic and its pervasive impacts.[1] As of June 2023, the Centers for Disease Control and Prevention reported over 1.1 million COVID-19 deaths nationwide. *Seaplane Adventures, LLC v. County of Marin*, 71 F.4th 724, 726 (9th Cir. 2023). By the end of the local health emergency, COVID-19 resulted in over 2,140 deaths in Alameda County alone.[2]

Beyond the physical danger, the pandemic threatened financial stability and housing security. Many residents would not receive paid sick leave if forced to quarantine. 3-ER-333. Some would also face an impossible choice between paying for housing or for food, medical care, and other necessities. 3-ER-334. Furthermore, housing instability and displacement would increase the risk of disease transmission and further exacerbate the pandemic's impacts. 3-ER-335. Losing housing would also compound residents' hardship with relocation costs, stress and anxiety, and potential homelessness. 3-ER-334.

## II. The County enacts a temporary eviction moratorium to mitigate the pandemic's impacts.

On April 21, 2020, the County adopted Urgency Ordinance No. O-2020-23, which enacted the Moratorium. 3-ER-333-45. The temporary

---

[1] *See* World Health Organization webpage on Tracking SARS-CoV-2 variants (last accessed Feb. 2, 2026), *available at* https://www.who.int/activities/tracking-SARS-CoV-2-variants; *El Papel LLC v. Durkan*, No. 2:20-cv-01323-RAJ-JRC, 2021 WL 4272323, at *5-6 (W.D. Wash. Sep. 15, 2021) (noting "drastic surge in COVID-19 cases" in late 2021).

[2] *See* Alameda County Public Health Department webpage on COVID-19 Data (last accessed Feb. 2, 2026), *available at* https://covid-19.ac-gov.org/data.page.

Moratorium aimed "to reduce the transmission of COVID-19, to promote housing stability during the COVID-19 pandemic and to prevent avoidable homelessness." 3-ER-324 (Alameda County Code of Ordinances ("ACCO") § 6.120.010). It had three main components: (1) a general moratorium on evictions (3-ER-325-26 (ACCO § 6.120.030)); (2) a moratorium on evictions based on nonpayment of rent due to COVID-19-related hardship (3-ER-326-27 (ACCO § 6.120.040)); and (3) provisions for the repayment of back rent (3-ER-329 (ACCO § 6.120.090)). The Moratorium would expire automatically 60 days after the County Health Office declared an end to the local health emergency. 3-ER-325-26 (ACCO §§ 6.120.030(A), 6.120.040(A)).

The general moratorium provided a defense to unlawful detainer and other repossession actions. 3-ER-326 (ACCO § 6.120.030(D)). A landlord or lender could not assess late fees, fines, or interest on rent due during the Moratorium. *Id.* (ACCO § 6.120.030(E)). Nevertheless, evictions could proceed under any of three circumstances: (1) the landlord was removing the unit from the rental market pursuant to the Ellis Act, California Government Code sections 7060 et seq., (2) a government or court order required vacating the unit, or (3) "[c]ontinued occupancy by the resident pose[d] an imminent threat to health or safety." 3-ER-326-27 (ACCO § 6.120.030(F)).

The Moratorium also provided a defense to unlawful detainer and other repossession actions where a tenant could not make rent or mortgage payments due to "substantial loss of income, substantial out-of-pocket medical expenses, or extraordinary child care needs . . . caused

16

by COVID-19." *Id.* (ACCO § 6.120.040(A), (D)). As with the general moratorium, a landlord could not assess late fees, fines, or interest on late rent resulting from a qualifying loss. 3-ER-327 (ACCO § 6.120.040(E)). The Moratorium required tenants to "document[]" any such COVID-19-related financial hardship and provide that evidence to landlords upon request. 3-ER-328 (ACCO § 6.120.060(B)-(F)).

The Moratorium expressly preserved tenants' "liability for unpaid rent or mortgage payments." 3-ER-329 (ACCO § 6.120.090(A)). If a tenant failed to repay rent that became due during the Moratorium, the "landlord may collect the back rent as any other consumer debt" after one year from when the rent became due. 3-ER-329 (ACCO § 6.120.090(D)).

## III. CAA challenged the Moratorium, and the district court repeatedly rejected their claims.

On May 5, 2022, CAA sued to challenge the Moratorium. 3-ER-376. Their original complaint named eight plaintiffs and raised facial and as-applied constitutional claims, including physical and regulatory takings claims, a Contracts Clause claim, and procedural and substantive due process claims, as well as inverse condemnation and preemption claims under state law. 3-ER-376-400.

CAA moved for partial summary judgment on their facial physical takings claim, facial Contracts Clause claim, and facial state law challenges. 1-ER-3. The district court denied the motion on November 22, 2022. *Id.* The court held that *Yee* defeated CAA's physical takings claim. 1-ER-14-22. The Moratorium resembled the rent control regime in *Yee* because it did not apply to uninvited strangers, did not absolve tenants

17

of their obligation to pay rent, was cabined by exceptions, and lasted only for the duration of the local health emergency. *See* 1-ER-17-22. The court also held that the Moratorium did not violate the Contracts Clause. 1-ER-22-29. It held that, as a temporary and limited restriction on some evictions, the Moratorium did not substantially impair CAA's leases. 1-ER-25-27. And in any event, the County had appropriately and reasonably tailored the Moratorium to its significant and legitimate purposes: mitigating housing instability and disease spread during a pandemic. 1-ER-27-29.

On February 28, 2023, both the California State of Emergency and the County's local public health emergency ended. 2-ER-124-25. The Moratorium therefore expired automatically on April 29, 2023. 3-ER-325-26 (ACCO §§ 6.120.030(A), 6.120.040(A)).

After allowing plaintiffs in the related case *Landlords and Property Management Companies in Alameda County v. County of Alameda*, No. 25-6142 ("*Landlords*' case"), several months to file an amended complaint, the County moved to dismiss the amended complaint in the *Landlords* case and moved for judgment on the pleadings in this action. 1-ER-56-57. The motion for judgment on the pleadings sought dismissal of CAA's physical takings, Contracts Clause, due process, and state law claims without leave to amend; dismissal of the *Penn Central* regulatory takings claim with leave to amend; and dismissal of Plaintiff California Apartment Association on standing grounds. *See id*.

The district court granted the County's motion in its entirety and granted CAA leave to amend their *Penn Central* claim. 1-ER-57. The

court applied its prior holding on CAA's physical takings and Contract Cluse claims to both their facial and as-applied claims. 1-ER-60, 65. On CAA's *Penn Central* claim, the court held that they did not allege a severe economic impact to the value of their properties, rejecting their attempts to rely on lost income. 1-ER-60-62. The court directed CAA to "be more specific as to before-and-after [property] values." 1-ER-62.

*Half a year later*, CAA filed their First Amended Complaint ("FAC"), alleging additional facts about the five properties at issue. 2-ER-83-119. For example, the FAC alleged estimated totals for lost rent and property damage for the listed properties. 2-ER-100-18. But it alleged a change in property value for only four of the five properties. *See* 2-ER-102, 106, 109-10, 117. And the FAC did not explain its asserted changes in property value at all. *Id.* The County provided the district court with a table that summarized the allegations of property value (or lack thereof) for each property in the FAC and the alleged bases for those values. Supplemental Excerpts of Record ("SER") 3.

The County again moved to dismiss CAA's *Penn Central* claim, and the court granted the motion without leave to amend. 1-ER-68-69, 78. Relying on a recent Ninth Circuit decision, the court held that CAA again failed to allege that the Moratorium had a sufficiently severe impact on their property values. 1-ER-76-77 (citing *Colony Cove*, 888 F.3d at 451). It found that all of the alleged diminutions in property value were less than 50 percent, which does not amount to the "functional[] equivalent" of the "classic taking in which government directly appropriates private property or ousts the owner." 1-ER-76 (quoting *Lingle v. Chevron U.S.A.*

19

*Inc.*, 544 U.S. 528, 539 (2005)). The court also held that the other two *Penn Central* factors, CAA's investment-backed expectations and character of the Moratorium, weighed against finding a taking. 1-ER-77-78.

CAA appealed the district court's dismissal of their physical takings, regulatory takings, and Contract Clause claims. *See* 3-ER-401-74; *see generally* Appellants' Opening Brief ("AOB").

## STANDARD OF REVIEW

This Court reviews de novo a district court's judgment following a motion to dismiss. *Shanks v. Dressel*, 540 F.3d 1082, 1086 (9th Cir. 2008). In doing so, it accepts all factual allegations in the complaint as true. *TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999). However, "the court need not accept conclusory allegations of law or unwarranted inferences," and dismissal is proper "if the facts are insufficient to support a cognizable claim." *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 794 (9th Cir. 2007).

## SUMMARY OF ARGUMENT

1.     The district court correctly held that the Moratorium did not effect a physical taking. The Supreme Court established in *Yee* that regulations governing landlord-tenant relationships—including restrictions on eviction—do not cause physical takings because landlords voluntarily invite tenants onto their properties. The physical takings doctrine applies only when the government compels property owners to accept uninvited strangers, not when it regulates preexisting commercial relationships.

20

a. This Court and numerous others have applied *Yee* to reject physical takings challenges to COVID-19 eviction moratoria. *See*, *e.g.*, *GHP Mgmt. Corp. v. City of Los Angeles*, No. 23-55013, 2024 WL 2795190, at \*1 (9th Cir. May 31, 2024) ("*GHP*"), *cert. denied*, 145 S. Ct. 2615 (2025); *El Papel, LLC v. City of Seattle*, No. 22-35656, 2023 WL 7040314, at \*1-2 (9th Cir. Oct. 26, 2023) ("*El Papel*"), *cert denied*, 144 S. Ct. 827 (2024).

b. The Moratorium did not grant access to trespassers or strangers. It applied only to tenants, people CAA voluntarily invited onto their properties and to whom they had already granted possession. Nor did the Moratorium impair CAA's other rights. It temporarily limited one remedy for breach of lease while preserving CAA's rights to enforce lease compliance through other legal proceedings. And CAA could still pursue evictions under the Ellis Act, to comply with court or government orders, and in situations involving threats to health or safety.

c. CAA's reliance on *Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021), is misplaced. *Cedar Point* involved a regulation granting strangers access to private agricultural land. It has no application where, as here, the government merely regulates the terms on which landlords may evict tenants that they invited onto their property.

d. If CAA is correct that *any* limitation on the right to exclude triggers physical takings scrutiny, then wide swaths of regulation, including rent control, minimum wage laws, and public accommodation laws would all be subject to the physical takings analysis. The Supreme Court and this Court have repeatedly rejected such a sweeping interpretation of the physical takings doctrine.

21

2. After multiple opportunities, CAA failed to allege a severe economic impact to property values, which is essential to stating a regulatory takings claim under *Penn Central*.

a. In *Colony Cove*, this Court held that economic impact must be measured by comparing the total value of property before and after the challenged regulation. Operating expenses and lost rental income cannot substitute for allegations of reduced property value.

b. For one of the five properties at issue, CAA alleged no diminution in property value whatsoever. The alleged diminutions for the other four properties all fell well below 50 percent—and this Court recognized in *Colony Cove* that no court has ever found a taking where a property retained the majority of its value.

3. The remaining *Penn Central* factors also weigh against finding a taking. Even if CAA had alleged a sufficient economic impact— which they did not—the other *Penn Central* factors confirm that no taking occurred.

a. The Moratorium did not interfere with CAA's reasonable investment-backed expectations. The Supreme Court previously upheld emergency housing regulations in response to unique crises in *Block v. Hirsh*, 256 U.S. 135 (1921) (World War I), and *Home Building & Loan Association v. Blaisdell*, 290 U.S. 398 (1934) (Great Depression). CAA also chose to enter a heavily-regulated industry in which state and local governments have long imposed restrictions on the landlord-tenant relationship, including limits on eviction. CAA

22

reasonably should have expected that the County would adopt further restrictions in response to another public health emergency.

b.     The character of the Moratorium weighs against finding a taking. It is a paradigmatic example of economic regulation that adjusts the benefits and burdens of commercial life. This Court has repeatedly upheld rent control and eviction restrictions against *Penn Central* challenges, recognizing that such regulations merely adjust economic burdens within the landlord-tenant relationship. *Colony Cove*, 888 F.3d at 454; *Rancho de Calistoga v. City of Calistoga*, 800 F.3d 1083, 1091 (9th Cir. 2015).

4.     The district court correctly dismissed CAA's Contracts Clause claim. The Moratorium did not substantially impair CAA's contractual rights and was reasonably tailored to advance significant and legitimate public purposes.

a.     The Moratorium did not substantially impair CAA's contractual rights because it preserved tenants' obligation to pay rent and landlords' ability to enforce lease compliance outside of the unlawful detainer process, including by collecting delinquent rent as consumer debt after one year. Courts have consistently held that temporary delays in the availability of unlawful detainer to enforce lease terms do not substantially impair contracts where other remedies remain available and rent obligations persist. CAA thus cannot satisfy the first element of a Contracts Clause claim.

b.     Emergency eviction limits enacted in response to a pandemic are foreseeable given the historical backdrop of pervasive

23

housing regulation and past emergency measures upheld by the Supreme Court. Existing regulation of the landlord-tenant relationship includes mandatory notice periods, just cause requirements, and rent control ordinances. Against this backdrop, CAA could not reasonably have expected to be free from further restrictions during an emergency.

c. This Court's decision in *AAGLA* forecloses CAA's claim. In *AAGLA*, this Court upheld a nearly identical COVID-19 eviction moratorium, holding that it reasonably advanced the legitimate public purposes of promoting housing stability and reducing disease transmission during the pandemic. The moratorium in *AAGLA*, like the one here, was tied to the duration of the local emergency, preserved rent obligations, and included exceptions for certain evictions. Faced with this binding precedent, CAA's Contracts Clause claim must fail.

d. CAA's attempts to distinguish *AAGLA* based on the Moratorium's duration or scope are unavailing. Both the timing of this Court's decision and the specific contours of the eviction restrictions are immaterial to *AAGLA*'s central holding: governments act reasonably when they temporarily limit evictions to serve valid public health and housing stability goals during an emergency. The County's decision to adopt the Moratorium is also entitled to deference.

## ARGUMENT

**I.** **Per se takings occur only in an extreme case where regulation compels a landowner to allow physical occupation by a stranger. The vast majority of challenges are governed by *Penn Central.***

Historically, the Takings Clause applied only to direct physical appropriation of property. But in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922), the Supreme Court recognized that regulation could be "so onerous that its effect is tantamount to a direct appropriation or ouster" and thereby causes a taking. *Lingle*, 544 U.S. at 537. Most takings cases apply the multi-factor test from *Penn Central*. "The goal is to determine whether regulatory actions 'are functionally equivalent to the classic taking in which government directly appropriates private property.'" *Colony Cove*, 888 F.3d at 450 (quoting *MHC Fin. LP v. City of San Rafael*, 714 F.3d 1118, 1127 (9th Cir. 2013))

The Court has nevertheless recognized "two relatively narrow categories" of per se takings for regulations that either (1) "completely deprive an owner of all economically beneficial use" or (2) "require[] an owner to suffer a permanent physical invasion." *Lingle*, 544 U.S. at 538. CAA invokes the second category, rooted in *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982). There, the city required apartment owners to allow cable companies to install equipment on their buildings. *Id.* at 422-23. The Court held that compelled permanent physical occupation by a stranger effects a per se taking. *Id.* at 441.

This "very narrow" category applies only to interference with an owner's right to exclude *strangers*.[3] *Id.* The rule rests on the fact that "an owner suffers a special kind of injury when a *stranger* directly invades and occupies the owner's property." *Id.* at 436 (emphasis in original). "[S]uch an occupation is qualitatively more severe than a regulation of the use of property, . . . since the owner may have no control over the timing, extent, or nature of the invasion." *Id.* The rule does not apply, however, when the government merely limits a landowner's ability to exclude persons the landowner has invited onto the property. *FCC v. Fla. Power Corp.*, 480 U.S. 245, 252 (1987) ("*Fla. Power*") (holding *Loretto* inapplicable to rent regulations for cable companies leasing space on utility poles because "the element of required acquiescence is at the heart of the concept of occupation," and noting "the unambiguous distinction between a . . . lessee and an interloper with a government license"). The distinction between invited persons and strangers also explains why the physical takings doctrine does not apply to regulations governing access to premises generally open to the public. *See Cedar Point*, 594 U.S. at 157; *PruneYard Shopping Center v. Robins*, 447 U.S. 74, 82-84 (1980).

---

[3] *See Cedar Point*, 594 U.S. at 150-52 (citing *United States v. Causby*, 320 U.S. 256 (1946) (overflights by government aircraft took avigation easement); *Portsmouth Harbor Land & Hotel Co. v. United States*, 260 U.S. 327 (1922) (firing coastal defense guns across private property); *Kaiser Aetna v. United States*, 444 U.S. 164 (1979) (public access to private pond and marina); and *Nollan v. Cal. Coastal Comm'n*, 438 U.S. 825 (1987) (exaction of public access easement along private beach)).

Most takings challenges to regulation are governed by *Penn Central* because the regulations fall short of requiring property owners to open private property to invasion by strangers. This case is no different because the Moratorium did not compel CAA to open their properties to uninvited third parties. CAA voluntarily entered into contracts with tenants, inviting them onto the property.

## II.  The Moratorium regulated preexisting landlord-tenant relationships and thus did not cause a physical taking.

CAA contends that the Moratorium effected a physical taking by granting a possessory interest to trespassers. AOB 42-46. But this Court (twice), alongside numerous others, has already refused to apply the physical takings rubric to COVID-19 eviction moratoria. They all agree that, because such moratoria merely adjust the terms of a landlord-tenant relationship, *Yee* dictates that they are subject to review under the traditional regulatory takings framework. As the district court recognized, the law is clear that the County's regulation of such an existing commercial relationship could not cause a physical taking.

### A.  This Court and many others have applied *Yee* to COVID-19 eviction moratoria and refused to find them to be physical takings.

Nearly every court to consider challenges to eviction moratoria adopted in response to COVID-19, including this Court, has held that a landlord who invites tenants to rent her property does not suffer a physical invasion when the government temporarily restricts her ability to evict those tenants. *See GHP*, 2024 WL 2795190, at *1; *El Papel*, 2023 WL 7040314, at *1-2; *238 Serrano Props. LLC v. California*, No. 2:24-cv-

08443-SSS-SSCx, 2025 WL 2946988, at *5 (C.D. Cal. Sep. 22, 2025), *appeal dismissed*, No. 25-6750, 2026 WL 190455, at *1 (9th Cir. Jan. 22, 2026); *Harris v. City of Los Angeles*, No. EDCV 24-2679 JGB (SPx), 2025 WL 2300169, at *5-6 (C.D. Cal. Jul. 31, 2025); *Stuart Mills Props., LLC v. City of Burbank*, No. 2:22-cv-04246-RGK-AGR, 2022 WL 4493573, at *2-3 (C.D. Cal. Sep. 19, 2022); *Farhoud v. Brown*, No. 3:20-cv-2226-JR, 2022 WL 326092, at *10 (D. Or. Feb. 3, 2022); *S. Cal. Rental Hous. Ass'n v. Cnty. of San Diego*, 550 F. Supp. 3d 853, 865-66 (S.D. Cal. 2021), *appeal dismissed as moot*, No. 21-55798, 2022 WL 16832819 (9th Cir. Nov. 9, 2022); *Cmty. Housing Improvement Prog. v. City of New York*, 59 F.4th 540, 552-53 (2nd Cir. 2023); *Gallo v. District of Columbia*, No. 1:21-cv-03298 (TNM), 2023 WL 7552703, at *5-6 (D.D.C. Nov. 14, 2023), *aff'd on other grounds*, No. 23-7158, 2025 WL 1446283 (D.C. Cir. May 20, 2025); *Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 388 (D. Mass. 2020); *Auracle Homes, LLC v. Lamont*, 478 F. Supp. 3d 199, 220 (D. Conn. 2020); *Elmsford Apt. Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148, 162–64 (S.D.N.Y. 2020), *appeal dismissed as moot*, *36 Apt. Assocs., LLC v. Cuomo*, 860 Fed. Appx. 215 (2d Cir. 2021). The court in each case found that *Yee*, not the physical takings doctrine, governed.

In *Yee*, the Court held that residential rent control regulation—including regulation of eviction—did not cause a physical taking. 503 U.S. at 531-32. *Yee* involved a challenge to a local mobile home rent control ordinance restricting eviction of mobile home owners. *See id.* at 524-25. The plaintiffs alleged that, in conjunction with a state statute, the ordinances made mobile home owners unwanted "perpetual tenant[s]

28

of the park" and had "transferred a discrete interest in land—the right to occupy the land indefinitely at a submarket rent—from the park owner to the mobile home owner." *Id.* at 527.

The Court roundly rejected the argument. "The government effects a physical taking only where it *requires* the landowner to submit to the physical occupation of his land." *Id.* (citing *Fla. Power*, 480 U.S. at 252); *see also id.* (holding the physical takings doctrine applies only to "a compelled physical invasion of property"). By contrast, the mobile home park owners had "voluntarily open[ed] their property to occupation by others" (*Yee*, 503 U.S. at 531); the "tenants were invited by [the park owners], not forced upon them by the government" (*id.* at 527-28). The government did not require park owners to continue renting their parks in perpetuity; park owners could still evict tenants to change the use of the property.[4] *Id.*

Applying the same reasoning, courts have found that COVID-19 eviction moratoria do not effect per se takings because they do not compel property owners to rent to persons with no right to be there. *See, e.g., 238 Serrano Props. LLC*, 2025 WL 2946988, at *5 ("Plaintiffs chose to enter the rental market, offered their properties for rent, and invited tenants

---

[4] The Ninth Circuit has since consistently evaluated a variety of landlord-tenant regulations through the lens of traditional regulatory, rather than physical, takings. *See Ballinger v. City of Oakland*, 24 F.4th 1287, 1292-93 (9th Cir. 2022); *Rancho de Calistoga*, 800 F.3d at 1089 n.1 ("The Supreme Court laid to rest any argument that a mobile home rent control ordinance constitutes a physical taking in Yee."); *MHC Fin. LP*, 714 F.3d at 1126-27; *Guggenheim v. City of Goleta*, 638 F.3d 1111, 1120 (9th Cir. 2010) (en banc).

into the properties.") (citing *GHP*, 2024 WL 2795190, at *1). The moratoria therefore did not interfere with the landlords' right to possession because they had already granted possession to their tenants by leasing the properties. *See also Howard v. County of Amador*, 220 Cal. App. 3d 962, 972 (1990) (a "lease gives the lessee the exclusive possession of the premises against all the world, including the owner"); *Ballinger*, 24 F.4th at 1293 ("[W]hen a person voluntarily surrenders liberty or property, like when [owners] chose to rent their property . . . the State has not *deprived* the person of a constitutionally protected interest.") (internal quotation marks omitted).

For example, in *GHP* and *El Papel*, plaintiff landlords brought a physical takings claim against Los Angeles's COVID-19 eviction moratorium and Washington's and Seattle's eviction moratoria, respectively. *See GHP*, 2024 WL 2795190 at *1; *El Papel*, 2023 WL 7040314, at *1. The challenged moratoria temporarily established general prohibitions on evictions subject to certain exceptions and excused nonpayment of rent. *See GHP Mgmt. Corp. v. City of Los Angeles*, No. CV 21-06311 DDP (JEMx), 2022 WL 17069822, at *1 (C.D. Cal. Nov. 17, 2022) (prohibiting evictions for nonpayment of rent and allowing up to 12 months after end of the emergency for repayment, no-fault reasons, and lease violations related to unauthorized occupants and pets); *El Papel LLC*, 2021 WL 4272323, at *3-5 (excepting evictions to address "imminent threat[s] to the health or safety" and prohibiting collection of late fees or related charges). The *GHP* and *El Papel* plaintiffs, like CAA here, argued that *Yee* did not apply and that the moratoria effected a

30

physical taking under *Cedar Point* because they effectively compelled access to plaintiffs' property. *GHP*, 2024 WL 2795190, at \*1; *El Papel*, 2023 WL 7040314, at \*2.

This Court rejected plaintiffs' claims in both cases. It held that the moratoria did not effect physical takings because they did not *require* plaintiffs to submit to physical occupation. *See GHP*, 2024 WL 2795190, at \*1; *El Papel*, 2023 WL 7040314, at \*2. Plaintiffs "voluntarily opened their property to occupation by tenants" and the moratoria "did not compel landlords to rent property in perpetuity." *GHP*, 2024 WL 2795190, at \*1; *see El Papel*, 2023 WL 7040314, at \*2 ("The Landlords here chose to use their property as residential rentals; the tenants' occupancy was not imposed over the Landlords' objection *in the first instance*.") (emphasis added). Under *Yee*, "a statute that merely adjusts the existing relationship between landlord and tenant, including adjusting rental amount, terms of eviction, and even the identity of the tenant, does not effect a taking." *GHP*, 2024 WL 2795190, at \*1.

The district court rightly applied these cases to dismiss CAA's physical takings claim. The Moratorium did not interfere with CAA's right to possession because it expressly applied only to "tenants," i.e., people to whom CAA had already granted entry and possession. 3-ER-325 ("'[r]esident' shall mean a tenant"), 326 ("[n]o landlord or lender may evict a resident," "It shall be an absolute defense to any unlawful detainer action against a resident"); *see* 1-ER-19, 21 ("Like the laws in *Yee*, the moratoria apply to tenants that the plaintiff landlords had already invited onto their property."). The Moratorium did not provide any rights

31

to third parties with whom CAA had no preexisting relationship—as the district court recognized. 1-ER-19.

Nor did the Moratorium impair CAA's nonpossessory use of their properties. *See Loretto*, 458 U.S. at 435-36 (where a physical taking has occurred, a landowner "can make no nonpossessory use of the property"); *Gallo v. District of Columbia*, 610 F. Supp. 3d 73, 89 (D.C. Cir. 2022). It expressly preserved tenants' obligation to pay rent and CAA's other remedies for breach. 3-ER-329 (ACCO § 6.120.090(A), (D)); 1-ER-44; *see also Hong Sang Market, Inc. v. Peng*, 20 Cal. App. 5th 474, 491 (2018) (landlords may maintain action for back rent independent of unlawful detainer). CAA also retained the right to take their units off of the rental market. *See* 3-ER-326 (ACCO § 6.120.030(F)); 1-ER-18-19. That CAA retained these substantial rights vis-à-vis their tenants confirms that the physical takings doctrine does not apply to the Moratorium.[5]

CAA takes issue with the district court's reference to the availability of alternative remedies and Ellis Act evictions.[6] AOB 51-55.

---

[5] CAA argues that the district court incorrectly relied on *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992), in considering the continuing obligation to pay rent because courts do not consider economic impact in a physical takings analysis. *See* AOB 52. But the court did not apply *Lucas's* "total wipeout" standard; it did not hold that the continuing obligation to pay rent and CAA's remaining financial interests were dispositive. *See* 1-ER-18. Rather, the court considered them among other facts to ultimately hold that the Moratorium, resembling the challenged ordinance in *Yee*, did not effect a physical taking.

[6] The Ellis Act establishes a procedure by which landlords can remove rental units from the market. *See* Cal. Gov't Code §§ 7060 et seq.

First, they argue that the ability to pursue a breach of contract action is "an illusory remedy" where the defendant is judgment-proof. AOB 52. But CAA did not allege that any of their tenants were actually judgment-proof. *See* 2-ER-100-18. They cite one example of an unsuccessful attempt to recover unpaid rent (AOB 52 (citing 2-ER-105-06)), but the corresponding allegations do not show that the tenant would have been judgment-proof had the landlord proceeded with his civil action. *See* 2-ER-105-06.

Second, CAA argues that some plaintiffs either could not rely on the Ellis Act to evict or attempted to do so but were unsuccessful. AOB 53-55. But these arguments go to the efficacy of Ellis Act evictions. They do not establish that the Moratorium's exception was an illusory remedy (i.e., that where a landlord would qualify for an Ellis Act eviction, the Moratorium otherwise prevented her from pursuing one). Certainly the Moratorium would prevent some evictions during the local health emergency, but as *Yee* held, that restriction did not effect a taking.[7]

---

[7] CAA relies on *Cwynar v. City and County of San Francisco*, 90 Cal. App. 4th 637 (2001) for this argument. AOB 55. But that case mistakenly categorizes *Yee* as about "purely economic rent control." In fact, the ordinance in *Yee* also restricted evictions. *See GHP,* 2024 WL 2795190, at *1, n.2; *supra* Section II.B. Moreover, *Cwynar* relied on a district court opinion that *Yee* effectively overruled. *Cwynar*, 90 Cal. App. 4th at 654-55 (citing *Ross v. City of Berkeley*, 655 F. Supp. 820, 836-42 (N.D. Cal. 1987) (citing *Hall v. City of Santa Barbara*, 797 F.2d 1493 (9th Cir. 1986), *overruled by Yee*, 503 U.S. at 526, 537-38)). It does not warrant ignoring *Yee* and the overwhelming number of cases which have upheld COVID-19 eviction moratoria against similar challenges.

CAA also attempts to undermine the district court's reference to the Moratorium's temporary nature by asserting that "[a] taking can be for a limited term." AOB 47 (quoting *Hendler v. United States*, 952 F.2d 1364, 1376 (Fed. Cir. 1991)). But the district court did not rely on the Moratorium's temporary nature in declining to apply the physical takings doctrine. The court's discussion served only to show that the Moratorium did not come within *Yee*'s dictum suggesting that a different rule might apply to a regulation requiring a landlord to "refrain *in perpetuity* from terminating a tenancy."[8] 1-ER-18 (quoting *Yee*, 503 U.S. at 528) (emphasis added).

Accordingly, *Yee* dictates that the Moratorium could not cause a physical taking.

### B. The Moratorium was a permissible limitation on "the right to exclude." *Cedar Point* is inapposite because it applies only where a regulation grants access to strangers.

CAA concedes that the district court's application of *Yee* to this case is consistent with *GHP*, *El Papel*, and "several" others upholding similar moratoria. AOB 47-48. They ask the Court to disregard those cases, look to out-of-circuit decisions, and instead apply *Cedar Point* to hold that the Moratorium effects a taking because "invaded [CAA's] 'right to exclude'." AOB 40-41, 47-50. But *Cedar Point* is inapplicable because it involved a compelled invasion by *strangers*.

---

[8] *Hendler* is also distinguishable because it involved a direct physical appropriation by the government. 175 F.3d at 1376 (agency's entry onto property to install wells and monitor groundwater).

34

*Cedar Point*—like the other physical takings cases—held only that the physical takings doctrine applies to restrictions on the right to exclude strangers. It is thus irrelevant to CAA's claim. *Cedar Point* involved a statute allowing union organizers to physically "take access" to agricultural properties. 594 U.S. at 143-44. The Supreme Court held that the statute effected a physical taking because it "appropriated a right of access" to the properties for the union organizers—persons with whom the property owner had no existing relationship. *Id.* at 152. Moreover, the Court distinguished *PruneYard*, where "[u]nlike the growers' properties, the [property] was open to the public." *Cedar* Point, 594 U.S. at 156. Unlike the union organizers, the tenants here were invited by CAA to "access" and possess their properties. As explained above, this distinction is critical because the Moratorium did not "take" any access that CAA had not already granted to tenants. *See supra* Sections I, II.A.

CAA cites two out-of-circuit cases to support its view that *Cedar Point*, and not *Yee*, applies here. *See* AOB 48-51. But these cases erroneously distinguish *Yee*. *Heights Apartments, LLC v. Walz*, 30 F.4th 720 (8th Cir. 2022), misreads *Yee*. There, the Eighth Circuit mistakenly concluded the ordinance in *Yee* did not restrict eviction—an error this Court recognized in declining to follow the case. *GHP,* 2024 WL 2795190, at *1, n.2.

And the Federal Circuit in *Darby Development Company, Inc. v. United States*, 112 F.4th 1017 (Fed. Cir. 2024), distinguished *Yee* on the grounds that the ordinance permitted evictions for nonpayment of rent.

35

*See id.* at 1035. But, *Yee* did not turn on the fact that the park owners could still evict for nonpayment of rent. The Court held that the ordinance did not effect a taking because the park owners had "voluntarily rented their land to mobile home owners" and the city did not compel the owners to rent their property. 503 U.S. at 527-28. Likewise, here, CAA voluntarily entered the rental market and entered into agreements with their tenants. Thus, under *Yee*, CAA cannot state a physical takings claim. *Darby* also undermines CAA's reliance on *Cedar Point* because it states that the landlords' voluntary invitation of tenants "distinguishes this case from *Cedar Point*." 112 F.4th at 1036.

CAA argues that they have an unlimited right to exclude tenants who breach the lease, because they "were, in legal effect, trespassers."[9] AOB 46. This argument is wrong as a matter of law. Unlike trespassers, a tenant, even one in breach, has a continuing interest in the leasehold until a court rules otherwise. *See Davidson v. Quinn*, 138 Cal. App. 3d Supp. 9, 11-12 (1982) ("The failure of [a] tenant to pay rent does not *ipso facto* work a forfeiture of the leasehold."); *Lee v. Baca*, 73 Cal. App. 4th

---

[9] The cases cited by CAA (AOB 46 n.15) do not demonstrate that they have an unlimited right to exclude tenants in breach. Those cases hold that where a tenant is in breach, "the owner must use the unlawful detainer procedure." *Spinks v. Equity Residential Briarwood Apts.*, 171 Cal. App. 4th 1004, 1038 (2009); *W. Union Telegraph Co. v. Hansen & Rowland Corp.*, 166 F.2d 258 (9th Cir. 1948) (finding Washington unlawful detainer statute applicable). *Spinks* actually confirms that even tenants in breach have protected interests in the property. 171 Cal. App. 4th at 1038 ("if the owner ousts the tenant forcibly, the tenant may regain possession by an action for forcible entry.").

1116, 1119 (1999) ("[A] tenant has no legal or equitable interest in rented property once a judgment for possession has been entered in favor of the landlord."). Indeed, California's unlawful detainer statutes do not permit repossession upon breach. Landlords must provide notice of the breach to the tenant and allow an opportunity to cure before even filing an unlawful detainer action. Cal. Civ. Proc. Code § 1161. Even after obtaining a judgment, landlords must wait before enforcing a writ of possession. *Id.* § 1174.

## C. CAA's position would imperil legitimate rent control.

Furthermore, CAA's arguments threaten rent control, which despite policy arguments pro and con, remains a legitimate and common field of regulation. *Loretto*, 458 U.S. at 440 (reiterating government's "broad power to regulate housing conditions in general and the landlord-tenant relationship in particular"); *Ballinger*, 24 F.4th at 1292 (citing the same). Rent control simply cannot function without limiting eviction. "Without such [eviction] controls, the security of tenure objectives of rent control laws could be undermined and the threat of eviction could be used to nullify the operation of rent regulations." *Fisher v. City of Berkeley*, 37 Cal. 3d 644, 693 (1984) (internal quotation marks omitted), *see Block*, 256 U.S. at 157-58 (Holmes, J.) ("If the tenant remained subject to the landlord's power to evict, the attempt to limit the landlord's [rent] demands would fail."); *Parker v. Fleming*, 329 U.S. 531, 536-37 (1947); *Birkenfeld v. City of Berkeley*, 17 Cal. 3d 129, 148 (1976). By limiting eviction, rent control programs allow existing tenants to remain in their homes under regulated leases, despite the landlord's wish to "exclude"

37

them in favor of other, higher-paying tenants. As the Supreme Court has recognized, "a government regulation that merely prohibits landlords from evicting tenants unwilling to pay a higher rent . . . does not constitute a categorical taking." *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322-23 (2002) (citing *Block*). CAA's theory that every limitation on the "right to exclude" is a physical taking would cut a wide swath through these programs across the country.

In fact, CAA's absolutist view of the right to exclude could imperil a variety of long-accepted economic regulations. The 40-hour workweek or minimum wage can be reframed as restrictions on an employer's right to exclude from its property workers who refuse to work more than 40 hours or for less than the minimum wage. *Yee* resolves this problem by recognizing a distinction between regulation of the voluntary commercial relationship reflected in a lease and regulation that compels a landowner to suffer invasion by strangers.

## III. All three *Penn Central* factors weigh against finding a taking.

Regulatory takings occur where a regulation "goes too far" and is "so onerous that its effect is tantamount to a direct appropriation or ouster." *Lingle*, 544 U.S. at 537, 539; *Rancho de Calistoga*, 800 F.3d at 1088-89 (same). In evaluating such a claim, courts consider the three *Penn Central* factors: (1) "[t]he economic impact of the regulation on the claimant;" (2) "the extent to which the regulation has interfered with distinct investment-backed expectations;" and (3) "the character of the

38

governmental action." *Penn Central*, 438 U.S. at 124. Although the analysis is case-specific, courts do not hesitate to dismiss *Penn Central* claims where plaintiffs have not plausibly alleged a taking. *See GHP*, 2024 WL 2795190 at *2 (affirming dismissal of *Penn Central* claim); *Rancho de Calistoga*, 800 F.3d at 1091 (same).

None of the *Penn Central* factors support CAA's claims. Most importantly, despite multiple opportunities, CAA failed to allege facts showing that the Moratorium caused a severe loss of property value for each property. The district court therefore correctly dismissed its *Penn Central* claims. *See* 1-ER-78.

### A. CAA's *Penn Central* claims fail because they did not allege the severe impact to property value that this Court's precedent demands.

The FAC alleged various impacts to CAA's five properties, but none were sufficient to demonstrate a cognizable diminution in property value under *Penn Central*. *See* SER-3 (table summarizing allegations and deficiencies corresponding to each property). *Penn Central* requires a plaintiff to show a severe reduction in *property value*. The *Penn Central* analysis "focuses directly upon the severity of the burden that government imposes upon [the plaintiff's] private property rights," to determine whether the regulation is "functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Lingle,* 544 U.S. at 539. "[E]conomic impact" for purposes of a *Penn Central* claim "is determined by comparing the total value of the affected property before and after the government action." *Colony Cove*, 888 F.3d at 451; *see also id.* (holding

"the severity of the loss can be determined only by comparing the post-deprivation value to the pre-deprivation value"); *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497 (1987) ("our test for regulatory taking requires us to compare the value that has been taken from the property with the value that remains in the property").

Because a truly severe impact on the value of property is the sine qua non of a *Penn Central* claim, failure to allege that impact is fatal. *See GHP*, 2024 WL 2795190, at *2 (affirming dismissal where landlords "failed to allege the diminution in property values they suffered as a result of the eviction moratorium"); *accord Evans Creek, LLC v. City of Reno*, No. 21-16620, 2022 WL 14955145, at *1 (9th Cir. Oct. 26, 2022); *see also Colony Cove*, 888 F.3d at 451 (reversing jury verdict even assuming a diminution of 24.8 percent).

CAA's factual allegations fall *far* short of this Court's standard. First, the FAC did not allege *any* change in property value caused by the Moratorium for one of its properties. 2-ER-113-14; SER-3, line 4. CAA argues that they were not required to allege a change in property value at the pleading stage and could rely on assertions of expenses and lost income to support their claims. AOB 58, 62. But operating losses cannot be the basis for a *Penn Central* claim; CAA must show how those losses affected the value of their property. *See infra,* Section III.A.1.

Second, the FAC did not allege a diminution greater than 50 percent for the four remaining properties. 2-ER-102, 106, 109-10, 117; SER-3, lines 1-3, 5. CAA contends that the district court improperly rejected these allegations by setting a 50 percent threshold. AOB 59-61.

But no court has ever found a taking where plaintiffs retain the majority of their property value. *See infra,* Section III.A.2.

Because CAA cannot demonstrate a severe impact to property value—a prerequisite under *Penn Central*—their claims fail as a matter of law.

### 1. CAA cannot show economic impact based on operating losses.

CAA asserts that dismissal was improper because the district court "focused only on . . . losses in *equity value* caused by the Moratorium." AOB 60. They argue the court should have considered "other harms, including lost rental income." AOB 60, 62. But, as this Court affirmed in *Colony Cove*, *Penn Central* requires a showing of the regulation's impact on property value. And operating losses cannot substitute for a significant reduction in property value.

In *Colony Cove*, this Court expressly rejected the plaintiff's attempt to rely on operating losses as a measure of a rent control ordinance's economic impact. 888 F.3d at 452. It held that "[p]rojected income streams can contribute to . . . determining the post-deprivation value of property, but the severity of the loss can be determined only by comparing the post-deprivation value to pre-deprivation value." *Id.* at 451; *see also Keystone Bituminous Coal Ass'n*, 480 U.S. at 497. CAA therefore cannot rely on their operational losses to establish a taking. If they contend that those alleged losses affected the properties' market value, they must allege facts to support that conclusion.

41

This Court has repeatedly rejected *Penn Central* claims where the plaintiffs do not allege a severe impact to property value, even where they allege other harms. For example, in *GHP*, this Court affirmed dismissal of a *Penn Central* challenge to a COVID eviction moratorium because the landlords "failed to allege the diminution in property values they suffered as a result of the eviction moratorium, and alleged only the amount of rent lost."[10] 2024 WL 2795190 at *2. In *Saddle Mountain Minerals, LLC v. City of Richland*, No. 23-34622, 2024 WL 4903280 (9th Cir. Nov. 27, 2024), this Court affirmed summary judgment for the defendants where the plaintiffs similarly failed to show a decrease in the value of the affected property. The plaintiff argued that the city took its mineral rights by prohibiting mining and authorizing construction on its property. *Id.* at *2. It claimed the rights were worth $2.8 million, the estimated cost of clearing title to the property. *Id.* This Court held that estimate was "irrelevant to the economic impact of the City's zoning ordinances" because it did not measure "the value of the minerals themselves." *Id.*

Numerous other cases have similarly held that *Penn Central* requires more than a showing of increased costs or decreased income. Plaintiffs must plead a change in property value. *See Evans Creek*, 2022 WL 14955145, at *1 (affirming dismissal for failure to allege "any

---

[10] CAA highlights that *GHP* is unpublished. AOB 34 n.12, 47-48. Although this Court is not bound to follow *GHP*, that case applied well-established circuit precedent to uphold dismissal of a *Penn Central* challenge to a COVID-19 eviction moratorium at the pleading stage. It could not be more on-point.

information about the value of the property" before or after the challenged action); *Hotop v. City of San Jose*, 982 F.3d 710, 716-17 (9th Cir. 2020) (affirming dismissal where only alleged economic impact was inability to increase rent); *PVM Redwood Co. v. United States*, 686 F.2d 1327, 1328-29 (9th Cir. 1982) (affirming dismissal where plaintiffs alleged only an increase of production costs); *238 Serrano Props. LLC*, 2025 WL 2946988, at \*6 (loss of rental income, interest, and late fees insufficient to establish a *Penn Central* claim); *Russellville Legends, LLC v. United States*, 172 Fed. Cl. 455, 470 (Fed. Cl. 2024) (loss of business opportunity "do[es] not establish economic loss under the Fifth Amendment").

CAA's cited cases do not justify ignoring *Colony Cove*'s clear holding. *See* AOB 60-62. CAA quotes (AOB 60) a footnote in *Bridge Aina Le'a, LLC v. Land Use Commission*, 950 F.3d 610 (9th Cir. 2020), but there this Court discussed the measure of "just compensation *damages*" for a temporary taking, not the standard for evaluating whether a *Penn Central* taking has occurred. *Id.* at 632 n.12 (emphasis added). In fact, the Court's economic impact analysis in that case contradicts CAA's argument. The Court reaffirmed that the appropriate measure of economic impact was the change in the "land's fair market value" and found that the plaintiff's claimed damages "overstate[d] the relevant diminution in value." *Id.* at 631-32. The Court's conclusion was fully consistent with *Colony Cove*.[11]

---

[11] CAA cites Alabama or Oregon district court cases, but neither could countermand *this Court's* clear holding in *Colony Cove*. *See* AOB 61-62

> **2. The district court correctly declined to be the first court to recognize a *Penn Central* taking where the plaintiff's property retained the majority of its value.**

CAA also argues that they do not need to allege before-and-after property values or a greater-than-50-percent reduction in value. AOB 57-58. They assert that the district court improperly applied a heightened pleading standard and set a 50-percent threshold. AOB 58-59. But the district court did not require CAA to *prove* that their property values actually decreased as alleged. Nor did the court create a new threshold for *Penn Central* claims. It simply recognized—as this Court has done—that no court has ever found a compensable taking based on a diminution in value of less than 50 percent. 1-ER-76 (quoting *Colony Cove*, 888 F.3d at 451). CAA's allegations, falling short of that benchmark, failed to state a claim.

To state a *Penn Central* claim, a plaintiff must allege that the challenged regulation had a truly *severe* impact on the value of her property. The regulatory burden must be "*so onerous* that its effect is tantamount to a direct appropriation or ouster." *Lingle*, 544 U.S. at 537 (emphasis added). Applying this principle in *Colony Cove*, this Court noted that it had held that reductions in value of "75% to 92.5% do[] not constitute a taking" and that it was "aware of no case in which a court

---

(discussing *Bordelon v. Baldwin County*, No. CA 20-0057-C, 2022 WL 16543269 (S.D. Ala. Oct. 28, 2022), and *David Hill Dev., LLC v. City of Forest Grove*, No. 3:08-cv-266-AC, 2012 WL 5381555 (D. Or. Oct. 30, 2012)). Moreover, the *David Hill* case predated *Colony Cove*.

has found a taking where diminution in value was less than 50 percent."[12] 888 F.3d at 451 (citing *CCA Assocs. v. United States*, 667 F.3d 1239, 1246 (Fed. Cir. 2011)). Indeed, courts have declined to find a taking despite much steeper diminutions in property value than those alleged by CAA. *See* 1-ER-76; *MHC Fin. LP*, 714 F.3d at 1127 (rejecting a claim alleging 81 percent diminution); *William C. Haas & Co., Inc. v. City & Cnty. of San Francisco*, 605 F.2d 1117, 1120-21 (9th Cir. 1979) (95 percent diminution); *Russellville Legends*, 172 Fed. Cl. at 470 (diminution of 55 percent is at the "low end of the spectrum").

Here, where CAA did allege diminutions in property value, they all fell well below what courts have found necessary for a *Penn Central* claim. *See* SER-3, lines 1-3, 5 (alleged diminutions range from 11.76 to 31.25 percent). The district court properly held those allegations could not support CAA's claims. 1-ER-76.

CAA does not dispute that their properties retained the majority of their value. They instead argue that requiring plaintiffs to allege a greater-than-50-percent diminution in property value (1) demands something more than does the Rule 8 pleading standard and (2) improperly sets a quantitative threshold for economic impact. AOB 58-60. Neither argument holds water.

---

[12] CAA states that *Colony Cove* is inapplicable because it was decided on appeal from a jury verdict. AOB 58-59. But "[*Colony Cove*'s] formula for determining economic impact is binding at all stages of the litigation process." *GHP*, 2024 WL 2795190, at *2 (affirming dismissal).

The district court's dismissal was a straightforward application of Rule 8. To survive dismissal, CAA must *allege* facts showing "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007)). A severe impact on the value of property is an indispensable element of a *Penn Central* claim. *See Colony Cove,* 888 F.3d at 451; *GHP*, 2024 WL 2795190, at *2; *Evans Creek*, 2022 WL 14955145, at *1. And *Colony Cove* further clarified that courts have not found a diminution in value of less than 50 percent to be sufficiently severe. 888 F.3d at 451. Accordingly, to state a plausible *Penn Central* claim, CAA had to allege for each property that the Moratorium "took" at least a majority of the property's value. They failed to do so. Based on CAA's own allegations, the Moratorium did not diminish their property values by more than 50 percent and its impact was not sufficiently severe to state a *Penn Central* claim. *See* 1-ER-76-77.

CAA points to dicta in *Bridge Aina Le'a* and *Russellville Legends* cautioning against adopting "litmus tests" or "strict cutoffs." *See* AOB 59. However, neither case contradicts *Colony Cove* or supports CAA's implication that a less-than 50 percent diminution in property value is sufficient to state a *Penn Central* claim.

To the contrary, both cases support affirmance. In *Bridge Aina Le'a*, this Court relied on *Colony Cove* to hold that, as a matter of law, the economic impact factor weighed against finding a taking where the diminution in value totaled a mere 16.8 percent. 950 F.3d at 632-33, 637. In *Russellville*, the court dismissed a *Penn Central* claim where the

46

plaintiff alleged a diminution in value of 55 percent. The court found that diminution "appear[ed] to be on the low end of the spectrum" and approvingly cited the same 50 percent threshold as this Court in *Colony Cove*. 172 Fed. Cl. at 470 (quoting *CCA Assocs.*, 667 F.3d at 1246). Therefore, both cases only reinforce the conclusion that diminution in value of less than 50 percent will not support a *Penn Central* claim.

CAA also relies on *Hodel v. Irving*, 481 U.S. 704 (1987). AOB 59-60. But as the district court recognized (1-ER-62), that case involved a narrow category of per se takings for "*complete abolition* of both the descent and devise of a particular class of property." *Hodel*, 481 U.S. at 717 (emphasis added). The challenged law addressed fractionation of indigenous land by providing for escheat of unproductive fractional interests upon the owner's death. *Id.* at 714. Though the escheated portions were fractions of the larger parcel, the law took 100 percent of each owner's interest. *See id.* Thus, *Hodel* did not involve diminution of less than 50 percent.

**B. CAA's failure to allege severe economic impact is fatal to their claims, but the remaining *Penn Central* factors also weigh against finding a taking.**

Because CAA has failed to allege a sufficiently severe impact to the value of any of their properties, they cannot prevail on their *Penn Central* claims. *See Colony Cove*, 888 F.3d at 451; *Evans Creek*, 2022 WL 14955145, at *1. Regardless, neither of the remaining *Penn Central*

47

factors—interference with reasonable investment-backed expectations or the character of the governmental action—supports CAA's claims.[13]

### 1. The Moratorium did not interfere with reasonable investment-backed expectations because it was limited in scope, temporary, and consistent with past emergency housing regulations.

Under the second *Penn Central* factor, courts evaluate a regulation's interference with a property owner's "distinct investment-backed expectation." *Penn Central*, 438 U.S. at 124. The reasonableness of an expectation is assessed based on the "regulatory environment at the time of the acquisition of the property." *Bridge Aina Le'a*, 950 F.3d at 633-34. CAA argues that reasonable expectations do not encompass a three-year deprivation of rent. AOB 63. They argue that the Moratorium interfered with their reasonable expectations to be paid rent and to evict destructive or breaching tenants. *Id.* But Supreme Court precedent shows that restrictions on eviction are foreseeable when responding to a health emergency. And the terms of the Moratorium were more limited than CAA suggests.

Limitations on evictions like those in the Moratorium were hardly unprecedented in the context of a widespread crisis. The Supreme Court previously upheld emergency housing regulations that affected landlords'

---

[13] And even if it were possible for CAA to be *the first plaintiffs in history* to state a takings claim based on reductions in property value of less than 50 percent, they would surely need to make an exceptionally compelling showing on the remaining *Penn Central* factors. They have not come close to doing so.

ability to collect rent or evict nonpaying residents. In *Block*, the Supreme Court upheld an emergency rent control regulation that responded to "dangerous . . . public health and burdensome" housing conditions brought on by World War I. 256 U.S. at 154. The regulation modified rents and permitted tenants to retain possession past expiration of their leases at modified rates. *Id.* at 153-54. And in *Home Building & Loan Association v. Blaisdell*, 290 U.S. 398, 420 (1934) ("*Blaisdell*"), the Supreme Court upheld an eviction moratorium enacted to mitigate the impacts of the Great Depression, a "nation wide and world wide business and financial crisis." *Id.* at 420, 423.

As in *Block* and *Blaisdell*, even though the Moratorium responded to an extraordinary emergency, CAA should have reasonably expected that the County would enact housing protections to respond to the widespread danger to health and safety.[14] *See Elmsford Apt. Assocs.*, 469 F. Supp. 3d at 169 (upholding COVID-19 eviction moratorium and finding "past regulation puts industry participants on notice that they may face further government intervention in the future"); *accord S. Cal. Rental Hous. Ass'n.*, 550 F. Supp. 3d at 862. Furthermore, the County adopted the Moratorium against the background of pervasive, preexisting state and local laws that regulate the landlord-tenant

---

[14] Nor was the COVID-19 pandemic without precedent. *See McDonald v. Cal. Dep't of Motor Vehicles in Sacramento Cnty.*, No. 2:21-cv-1561 KJM DB PS, 2022 WL 1460209, at *2 (E.D. Cal. May 9, 2022) (comparing COVID-19 to 1918 Spanish flu pandemic).

49

relationship, including a landlord's ability to evict tenants.[15] *See*, *e.g.*, Cal. Civ. Proc. Code §§ 1159-1179a (establishing unlawful detainer proceedings, including mandatory notice periods); Cal. Civ. Code § 1946.2 (requiring just cause for terminating long-term tenancies).

CAA also wrongly describes the Moratorium as a three-year deprivation of rent and suggests that it had no recourse against destructive or noncompliant tenants. *See* AOB 63. But the Moratorium preserved tenants' obligation to pay rent. 3-ER-329 (ACCO § 6.120.090(D)). In fact, landlords could recover delinquent rent as "as any other consumer debt" beginning just one year after the rent became due. *Id.* Furthermore, the Moratorium created a temporary defense only for unlawful detainer actions and included an express exception for "imminent threat[s] to health or safety." 3-ER-326 (ACCO § 6.120.030(F)). Therefore, the Moratorium did not affect landlords' ability to enforce lease terms through a breach of contract action.[16] It also likely still permitted evictions in some circumstances involving property destruction to prevent serious risks to CAA. At most, the Moratorium

---

[15] CAA cites language about the unexpected nature of the pandemic. AOB 63. But the cited cases ultimately rejected the plaintiffs' challenges to the moratoria. *See AAGLA*, 10 F.4th at 914; *GHP Mgmt. Corp.*, 2022 WL 17069822, at *6. In fact, the chorus of cases upholding COVID-19 eviction moratoria throughout the nation demonstrate that the County's action was not unprecedented.

[16] CAA asserts that alternative actions are an "illusory" remedy. AOB 64. But they do not allege that any plaintiffs were unable to successfully obtain a judgment or allege any facts to show that any tenants were judgment proof. *See supra*, Section II.B.

temporarily limited CAA's ability to pursue one remedy against a subset of tenants in breach of their leases.

### 2. The Moratorium was a permissible adjustment of economic burdens; the character factor weighs against finding a taking.

The "character" of a challenged regulation supports a finding of a taking if the regulation is comparable to a physical invasion of property, rather than "merely affect[ing] property interests through some public program adjusting the benefits and burdens of economic life to promote the common good." *Lingle*, 544 U.S. at 539 (internal quotations omitted). CAA asserts that the Moratorium functioned like a physical taking because CAA "lost all control of their property" and could not use, profit from, or sell their properties. AOB 65-66. They also assert that landlords alone were forced to bear "public burdens" while the Moratorium was in effect. AOB 66. But again, CAA misrepresents the nature of the Moratorium's limits.

As explained in Sections II.A and B, above, the Moratorium was not akin to a physical invasion. At most, it temporarily limited the availability of a single remedy for the breach of a lease—unlawful detainer—in some circumstances. It did not relieve tenants of their obligation to pay rent and landlords could still pursue unpaid rent in a breach of contract action. 3-ER-329 (ACCO § 6.120.090). The Moratorium also preserved landlords' ability to enforce other lease terms and initiate evictions in some circumstances. 3-ER-326 (ACCO § 6.120.030(F)). And the Moratorium did not force landlords alone to bear the pandemic's economic burdens. It expressly protected them from evictions based on

51

missed mortgage payments. *See* 3-ER-327 (ACCO § 6.120.040(D)) ("It shall be an absolute defense to any unlawful detainer action . . . based on a failure to timely make rent *or mortgage* payments") (emphasis added).

This Court has repeatedly upheld rent and eviction controls against *Penn Central* challenges, finding that they merely adjust economic burdens within the landlord-tenant relationship. *See Colony Cove*, 888 F.3d at 454 (character of rent control program weighed against finding a taking); *Rancho de Calistoga*, 800 F.3d at 1091 (rent control ordinance was "much more an adjustment of the benefits and burdens of economic life") (internal quotations omitted); *MHC Fin. LP*, 714 F.3d at 1128 (same).

CAA argues that the "extraordinary duration" of the Moratorium should be analyzed as an entirely separate factor weighing in favor of a *Penn Central* taking. AOB 67-69. But the impact of the Moratorium's duration—like all its aspects—is reflected in its impact on the *value* of the regulated properties. Considering duration as an aspect of the character factor, in addition to economic impact, is double-counting. Moreover, CAA does not argue that it was inappropriate to tie the Moratorium's duration to the underlying local emergency. They merely complain that three years was too long. This argument takes issue with the duration of the underlying health emergency, not the terms, or character, of the Moratorium.

## IV. The district court correctly dismissed CAA's Contracts Clause claim.

CAA contends the Moratorium impaired their leases in violation of the Contracts Clause, U.S. Const. art. I, § 10, cl. 1. AOB 71-81. The district court correctly dismissed this claim. 1-ER-29, 65.

"[N]ot all laws affecting pre-existing contracts violate the Clause." *Sveen v. Melin*, 584 U.S. 811, 819 (2018). It "does not . . . obliterate" the government's "sovereign right . . . to protect the lives, health, morals, comfort and general welfare of the people," which is "paramount to any rights under contracts." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 241 (1978) (quotation marks omitted). Courts therefore construe the Clause "narrowly in order to ensure that local governments retain the flexibility to exercise their police powers effectively." *Matsuda v. City & Cnty. of Honolulu*, 512 F.3d 1148, 1152 (9th Cir. 2008).

Every Contracts Clause claim must survive an exacting two-step inquiry. A plaintiff must first show that the challenged law substantially impairs a contractual relationship. *Sveen*, 584 U.S. at 819. If it has, the plaintiff must further prove that the law is not "drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose." *Id.* (internal quotation marks omitted).

The district court followed other courts that have rejected similar claims against COVID-19 eviction moratoria in concluding that CAA could not satisfy either element of the test. The Moratorium did not substantially impair CAA's contracts because it expressly preserved tenants' obligation to pay rent and allowed CAA to recover delinquent

53

rent after one year. Regardless, this Court has already held that temporary eviction limits are an appropriate and reasonable means of advancing the significant and legitimate public purposes of increasing housing stability and decreasing disease spread during a health emergency. *See AAGLA*, 10 F.4th at 914.

## A. The Moratorium did not substantially impair CAA's leases because it was a temporary restriction on only one remedy for breaches.

CAA argues the Moratorium substantially impaired their contracts over three years by "permit[ting] the tenant to retain possession . . . without having to pay rent or comply with material lease terms or legal requirements." AOB 71. To substantially impair a contract, a law must (1) "undermine[] the contractual bargain," (2) "interfere[] with a party's reasonable expectations," and (3) "prevent[] the party from safeguarding or reinstating his rights." *Sveen*, 584 U.S. at 819. The Moratorium satisfied none of these requirements: it left untouched tenants' obligation to pay rent and allowed evictions to proceed in some circumstances; it was a foreseeable regulatory response to a health emergency in light of past housing measures adopted during comparable emergencies; and it preserved other avenues for enforcing CAA's contractual rights though eviction was temporarily unavailable.

First, contrary to CAA's contention (AOB 71-72), the Moratorium explicitly maintained tenants' obligation to pay rent. 3-ER-329 (ACCO § 6.120.090(A)) ("[n]othing in this chapter relieves an Affected Resident of liability for unpaid rent or mortgage payments"). At most, the Moratorium delayed CAA's ability to recover delinquent rent. However,

54

courts have found that delays in eviction proceedings or the ability to collect rent do not substantially impair a landlord's contractual rights. *See Gallo*, 2023 WL 7552703, at *2 (upholding COVID-19 ordinance which delayed prosecution of eviction and ejectment actions); *Elmsford Apts. Assocs.*, 469 F. Supp.3d at 172 ("merely postpon[ing] the date on which landlords may commence summary proceedings against their tenants" did not impair contractual rights); *accord Auracle Homes*, 478 F. Supp. 3d at 227.

The Moratorium also still permitted landlords to collect past-due rent payments "as any other consumer debt" one year after a payment became due. 3-ER-329 (ACCO § 6.120.090(D)). Thus, CAA did not have to wait until the end of the Moratorium to collect late rent payments. They could have used alternative remedies to recover those payments. *See Blaisdell*, 290 U.S. at 430 ("Without impairing the obligation of the contract, the remedy may certainly be modified . . . it is competent for [governments] to change the form of the remedy.") (internal quotation marks omitted); *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 20 n.17 (1977) ("[A] reasonable modification of statutes governing contract remedies is much less likely to upset expectations than a law adjusting the express terms of an agreement.")

Second, the Moratorium did not interfere with the parties' reasonable expectations. In evaluating this factor, courts properly consider "whether the industry the complaining party has entered has been regulated in the past." *Energy Reserves Group, Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411-12 (1983). CAA asserts that they could not

55

have anticipated the scope of the Moratorium because it goes "so far beyond anything that came before [it]." AOB 74. But, as already discussed, the Moratorium resembles other emergency housing regulations which the Supreme Court has found constitutional. *See supra*, Section III.B.1 (discussing *Block* and *Blaisdell*).

And even existing non-emergency state and local laws impose limitations on a landlord's ability to evict tenants in breach of their lease. *See*, *e.g.*, Cal. Civ. Code § 1946.2 (requiring just cause for terminating long-term tenancies); Cal. Civ. Proc. Code §§ 1161 (requiring three days' notice before filing an unlawful detainer action), 1174 (requiring a five-day waiting period between deliverance of writ of possession and enforcement of the writ). Therefore, even if the COVID-19 pandemic was unexpected, the future regulation of the landlord-tenant relationship in response to the pandemic was foreseeable. *See Ballinger*, 398 F. Supp. 3d at 577 ("given the 'existence of extensive regulation' of the landlord-tenant relationship [landlords] could not reasonably have expected the regulatory landscape to remain unchanged indefinitely"); *accord Little Woods Mobile Villa LLC v. City of Petaluma*, 736 F. Supp. 3d 757, 772 (N.D. Cal. 2024); *S. Cal. Rental Hous. Ass'n*, 550 F. Supp. 3d at 862 (finding COVID-19 eviction moratorium "foreseeable to the extent the industry intersects with the health and safety of citizens").

And finally, the Moratorium did not prevent landlords from safeguarding or reinstating their rights. It provided a defense to only some unlawful detainer or possession actions. 3-ER-325-27 (ACCO §§ 6.120.030, 6.120.040). Where the Moratorium delayed CAA's ability to

evict a particular tenant, it still allowed them to enforce nonpayment of rent after a year (3-ER-329 (ACCO § 6.120.090(D)) and recover damages under the common law for breaches of lease covenants and waste. *See Walt v. Superior Court*, 8 Cal. App. 4th 1667, 1670, 1678 (1992) ("The lessor's right to recover damages for loss of the benefits of the lease *should be independent* of his right to bring an action for unlawful detainer."). Thus, CAA still retained their contractual rights to rent and lease compliance, which they could have enforced through civil actions beginning after, at most, one year.

CAA summarily asserts that non-eviction "remedies were *actually illusory* as applied to [it]." AOB 74. They rely on *Heights Apartments*, in which the Eighth Circuit concluded that "monetary relief obtained against a judgment-proof individual is an illusory remedy." 30 F.4th at 729 n.7. But here, CAA has not alleged facts to show that any of their tenants were judgment proof or that they unsuccessfully attempted to bring a civil action to enforce their leases.[17] *See* 2-ER-100-17; *Iqbal*, 556 U.S. at 679 ("mere conclusions[] are not entitled to the assumption of truth"); *supra*, Section II.A.

CAA also argues that "[t]he longer a moratorium lasts, the more severe the cumulative burdens on landlords." AOB 72-73. But they cannot explain how "long" is enough for a facially valid and expressly

---

[17] The closest CAA comes to such an allegation is to assert that a tenant refused to pay rent, the landlord filed suit, the tenant then paid a portion of the rent, and the landlord can no longer locate the tenant. 2-ER-105–06 (FAC ¶ 73). But this does not show that prosecuting a civil action to judgment would have been fruitless.

temporary law to substantially impair contracts. In fact, it would be exceedingly difficult, if not impossible, to establish such a rule. To the contrary, courts have appropriately deferred to the government and upheld laws that are "limited to the exigency which called [them] forth." *See Blaisdell*, 290 U.S. at 444-48. Here, the County properly tied the Moratorium's duration to that of the local COVID-19 public health emergency. 3-ER-325-26 (ACCO §§ 6.120.030(A), 6.120.040(A)); *see infra*, Section IV.B; *AAGLA*, 10 F.4th at 914 (upholding eviction moratorium tied to mayor's finding of local emergency); *see also Valley Investments-Redwood LLC v. City of Alameda*, No. 22-cv-06509-DMR, 2023 WL 2868838, at *9 (N.D. Cal. Apr. 10, 2023) (finding that challenged ordinances may "survive even the declared states of the emergency the Ordinances are supposedly addressing" was reasonable and entitled to deference).

CAA's comparison of *Blaisdell* and *W.B. Worthen Co. ex rel. Bd. of Commissioners of Street Improvement District No. 513 of Little Rock, Arkansas v. Kavanaugh*, 295 U.S. 56 (1935) ("*Worthen*"), does not support their argument. In *Blaisdell*, the Supreme Court upheld a temporary mortgage moratorium during an ongoing emergency which ultimately lasted for two years. *See Blaisdell*, 290 U.S. at 416-19. In *Worthen*, the court struck down a mortgage moratorium not because it was longer than that in *Blaisdell* or because the duration resulted in more severe impacts. Rather, the Court found that the mortgagor was "without an effective remedy" because the mortgagee had no "enforceable obligation" to pay. *Worthen*, 295 U.S. at 61. The Court in *Worthen* also distinguished

58

*Blaisdell* by noting that the regulation in *Blaisdell*—like the Moratorium here—was tied to the "then existing emergency" and still required payments even if it limited foreclosure. *Worthen*, 295 U.S. at 63. Moreover, in *Worthen*, the state was an interested party in the affected foreclosures. *Id.* at 57. Thus, it was not entitled to the same deference as in cases, such as this, involving wholly private contracts. *See Baptiste*, 490 F. Supp. 3d at 386-87 (contrasting *Blaisdell* and *Worthen*).

The Moratorium did not substantially impair CAA's contracts because it preserved tenants' obligations to pay rent, was consistent with reasonable expectations created by existing and prior regulations, and did not foreclose other enforcement remedies for landlords.

## B. The Moratorium reasonably advanced legitimate public health and housing stability objectives during a global pandemic.

The district court correctly relied on this Court's decision in *AAGLA* to hold that CAA's claim failed for the independent reason that the Moratorium directly served legitimate public purposes. A significant and legitimate public purpose is one that "remed[ies ] a broad and general social or economic problem." *Energy Reserves Group*, 459 U.S. at 411-12. The Moratorium must be upheld if its "adjustment of the rights . . . is based upon reasonable conditions and is . . . appropriate to the public purpose." *Id.*, 459 U.S. at 412 (citation omitted). When the government is not a contracting party, "courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *AAGLA*, 10 F.4th at 913 (quoting *Energy Reserves Group*, 459 U.S. at 413). The Moratorium, like many other COVID-19 eviction moratoria, reasonably

59

advanced its legitimate public purposes of increasing housing stability and mitigating disease spread during a pandemic. *See AAGLA*, 10 F.4th at 913-14; *Sveen*, 584 U.S. at 819.

The Moratorium aimed to "reduce the transmission of COVID-19, to promote housing stability during the COVID-19 pandemic and to prevent avoidable homelessness." 3-ER-324 (ACCO § 6.120.010). Courts have affirmed that these are significant and legitimate public purposes. *See Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 18 (2020) ("Stemming the spread of COVID-19 is unquestionably a compelling interest."); *AAGLA*, 10 F.4th at 913-14.

CAA does not seriously dispute that the Moratorium's purposes were significant and legitimate.[18] Rather, they claim those purposes grew less important, and thus the Moratorium *became* unreasonable, at some undefined, and undefinable, point in time. *See* AOB 77-78. But, again, the County tailored the Moratorium's duration to that of the local public health emergency. As this Court held in *AAGLA*, conditioning the termination of a COVID-19 eviction moratorium on that of the pandemic was eminently reasonable. *See AAGLA*, 10 F.4th at 910, 914-17.

---

[18] CAA asserts that "divorced from the exigencies of the pandemic," the Moratorium's stated goals of promoting housing stability and avoiding homelessness "have no obvious limit." AOB 78. But the Moratorium was expressly tied to the pandemic. *See* 3-ER-324 ("The purposes of this ordinance are . . . to promote housing stability *during the COVID-19 pandemic* and to prevent avoidable homelessness.") (emphasis added); 3-ER-325-26 (duration limited to that of the health emergency).

In *AAGLA*, this Court upheld a nearly identical eviction moratorium which had a "stated goal of preventing displacement from homes, which the city reasonably explain[ed] can exacerbate the [pandemic's] public health-related problems." *Id.* at 914. The city's moratorium established affirmative defenses for three kinds of evictions: (1) evictions for COVID-19-related nonpayment of rent during and up to one year after expiration of the emergency period, (2) no-fault evictions during the emergency period; and (3) evictions based on the pandemic-induced presence of unauthorized occupants, pets, or nuisance. *See Id.* at 909-10. The moratorium did not relieve tenants of their obligation to pay rent. *Id.* at 909. And the mayor had authority to terminate the emergency period, and therefore the moratorium. *Id.* at 910. This Court held that each of these provisions may be viewed as a reasonable attempt to advance the moratorium's valid public purpose. *Id.* Other courts have similarly upheld COVID-19 eviction moratoria as reasonable housing stability and disease mitigation measures. *238 Serrano Props. LLC*, 2025 WL 2946988, at *8-9; *Tatoma, Inc. v. Newsom*, No. 3:21-CV-098-BEN-JLB, 2022 WL 686965, at *3 (S.D. Cal. Mar. 8, 2022); *El Papel LLC*, 2021 WL 4272323, at *7-15, *aff'd on other grounds sub nom. El Papel, LLC v. City of Seattle*, No. 22035656, 2023 WL 7040314 (9th Cir. Oct. 26, 2023).

Like Los Angeles's moratorium, the Moratorium here sought to mitigate the pandemic's housing and health impacts and included many of the same provisions this Court upheld in *AAGLA*. While the eviction limits helped stabilize residents' living situations during the pandemic, the exceptions also acknowledged the need for evictions to proceed in

some situations to accommodate exigent circumstances. *See* 3-ER-325-26 (ACCO §§ 6.120.030, 6.120.040); *AAGLA*, 10 F.4th at 914 ("the eviction protections are necessary to avoid displacing residential tenants amidst a pandemic"). And by allowing delayed rent and mortgage payments while maintaining the obligations to make those payments, the Moratorium addressed economic hardships faced by both tenants and landlords. *See* 3-ER-326-27, 329 (ACCO §§ 6.120.040, 6.120.090); *AAGLA*, 10 F.4th at 914 ("late fees and interest could compound COVID-19 affected tenants' dilemmas"). The County also reasonably tied the Moratorium's duration to the termination of the local health emergency because the Moratorium aimed to mitigate the spread and impacts of that very emergency. *See* 3-ER-325-26 (ACCO §§ 6.120.030(A), 6.120.040(A)); *AAGLA*, 10 F.4th at 910. As this Court held in *AAGLA*, each of these provisions reasonably advanced the County's goals in increasing housing stability and preventing further disease spread during the pandemic. *See AAGLA*, 10 F.4th at 914.

CAA attempts to distinguish *AAGLA* by arguing that it was decided earlier in the pandemic and that "the passage of time is a key distinction." AOB 79. But the holding in *AAGLA* did not turn on the state of the pandemic at the time it was decided. Instead, this Court noted that the eviction moratorium would continue to remain in effect "during the Local Emergency Period," which would last to the end of the local emergency as declared by the Mayor." 10 F.4th at 910. The same was true here. 3-ER-325-26. In any event, CAA offers no independent standard by which the Court could evaluate the reasonableness of a moratorium's duration.

62

Next, CAA argues, without any citation to the Moratorium, that *AAGLA* is distinguishable because the Moratorium was "*far* broader than Los Angeles's." AOB 79. The facts are less clear. CAA states that Los Angeles "only" prohibited evictions for nonpayment of rent attributable to COVID-19. AOB 79-80. But, the Moratorium contained the same prohibition and, unlike in *AAGLA*, required tenants to provide proof of their hardship upon request. *Compare* 3-ER-326-28 (ACCO §§ 6.120.060, 6.120.050) *with AAGLA*, 10 F.4th at 910. The *AAGLA* moratorium also prohibited all "no-fault" evictions, *including* evictions for withdrawal of a unit from the rental market and compliance with laws or governmental orders. 10 F.4th at 909-10. By contrast, the Moratorium had exceptions for Ellis Act evictions and compliance with government or court orders. 3-ER-326 (ACCO § 6.120.030). Furthermore, Los Angeles's moratorium deferred repayment of rent to a year after the end of the local emergency. *AAGLA*, 10 F.4th at 910. Whereas the Moratorium here allowed landlords to collect past-due rent beginning a year from when the rent became due. 3-ER-329 (ACCO § 6.120.090(D)).

To the extent that one moratorium is more expansive than the other, both the County's and Los Angeles's decisions to enact their respective moratoria are entitled to deference. *See Energy Reserves Group, Inc.*, 459 U.S. at 412-13. Courts may not "second-guess" whether the Moratorium was "the most appropriate way[] of dealing with the problem."[19] *AAGLA*, 10 F.4th at 914 (quoting *Keystone Bituminous Coal*

---

[19] CAA also highlights that rental assistance availability factored into the Court's decision in *AAGLA*. AOB 80-81. But the result in *AAGLA* hardly

63

*Ass'n*, 480 U.S. at 506); *see also Seaplane Adventures*, 71 F.4th at 726 (judges act "not as public health officials operating in the midst of a dangerous health emergency, but rather as a generalist court bound to ensure the proper deference is given to local government officials.").

CAA's Contracts Clause claim fails because, as this Court held in *AAGLA*, a local government acts reasonably when it temporarily limits evictions to promote housing stability and minimize disease transmission during a public health emergency. *See* 10 F.4th at 913-14. The district court correctly declined to interrogate the County's legislative judgment about how to appropriately tailor the Moratorium to accomplish these unquestionably valid public purposes.

## CONCLUSION

For the foregoing reasons, the Court should affirm the judgment.

---

turned on that. The Court merely acknowledged that "the availability of such relief, while not dispositive, remains relevant." 10 F.4th at 916. It did not find that relief was actually available to plaintiffs or that local assistance programs could meet 100 percent of each resident's need. *See id.* (discussing prospective rental assistance funding).

February 10, 2026          SHUTE, MIHALY & WEINBERGER LLP


By:  ____s/Matthew D. Zinn____
     MATTHEW D. ZINN
     MINDY K. JIAN

     Attorneys for Defendants-Appellees
     County of Alameda and Board of
     Supervisors of the County of Alameda

65

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** _25-6068_____

I am the attorney or self-represented party.

**This brief contains _13,819_____ words,** including ____0_____ words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** __s/Matthew D. Zinn_____ **Date** _February 10, 2026_
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*