Case No. 25-6068

# In the United States Court of Appeals
# For the Ninth Circuit

**CALIFORNIA APARTMENT ASSOCIATION, STEPHEN LIN, RAKESH and TRIPTI JAIN, ALISON MITCHELL, MICHAEL HAGERTY, and H. ALEX and DANNIE ALVAREZ**

*Plaintiffs - Appellants,*

*v.*

**COUNTY OF ALAMEDA, BOARD OF SUPERVISORS OF THE COUNTY OF ALAMEDA, and DOES 1-25,**

*Defendants – Appellees.*

_____

# APPELLANTS' REPLY BRIEF

_____

On Appeal from the United States District Court
for the Northern District of California
The Honorable Laurel Beeler, Presiding
District Court Case No. 3:22-cv-02705-LB

NIELSEN MERKSAMER LLP
Christopher E. Skinnell (SBN 227093)
Hilary J. Gibson (SBN 287862)
2350 Kerner Boulevard, Suite 250
San Rafael, California 94901
Tel:  (415) 389-6800
Fax: (415) 388-6874
*Attorneys for Plaintiffs - Appellants*

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION.................................................................................8

ARGUMENT .......................................................................................9

    I.    PLAINTIFFS ADEQUATELY ALLEGED A PHYSICAL
        TAKING ................................................................................9

        A.    The Moratorium Deprived Plaintiffs of the
                Rights to Possess, Use, and Dispose of Their
                Property for Three Years .......................................9

        B.    *Yee v. City of Escondido* Does Not Support
                the District Court's Dismissal ...................................13

            1.    *Yee* was a fundamentally different case .............14

            2.    *Yee* did not hold that an initial
                  invitation forever after bars a takings
                  claim, despite changed circumstances................17

        C.    That the Moratorium Was "Temporary" Does
                Not Mean There Was No Taking................................20

        D.    Finding a Taking in This Case Would Not
                "Imperil Legitimate Rent Control" .............................22

    II.    PLAINTIFFS ALSO ADEQUATELY ALLEGED A
        TEMPORARY REGULATORY TAKINGS .........................................23

        A.    Plaintiffs Adequately Alleged Severe
                Economic Impact...........................................................23

        B.    Plaintiffs Adequately Alleged Interference
                with Their Reasonable, Investment-Backed
                Expectations.................................................................28

C.    The Character of the Moratorium Also Supports the Conclusion It Effected a Regulatory Taking .......................................................32

D.    The Moratorium's Extraordinary Duration Cannot Be Disregarded..............................................33

III.    PLAINTIFFS ADEQUATELY ALLEGED UNCONSTITUTIONAL IMPAIRMENT OF LEASE OBLIGATIONS ........................................................34

A.    *Of Course*, the Moratorium Substantially—Indeed, Severely—Impaired Lease Agreements ..............................................................34

B.    The Moratorium Was Not Tailored Appropriately to a Legitimate Purpose ......................37

C.    *AAGLA* Does Not Support the County's Three-Year-Long Maintenance of the Most Stringent Moratorium in the Country........................40

CONCLUSION ...................................................................42

CERTIFICATE OF COMPLIANCE (Form 8)..........................................43

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ala. Ass'n of Realtors v. HHS*,
594 U.S. 758 (2021) ...................................................... 10, 14, 31, 36

*Allied Structural Steel Co. v. Spannaus*,
438 U.S. 234 (1978) ......................................................... 34, 38, 39

*Apartment Ass'n of L.A. Cty., Inc. v. City of L.A.*,
10 F.4th 905 (9th Cir. 2021) ............................................. 37, 40, 41, 42

*Baptiste v. Kennealy*,
490 F. Supp. 3d 353 (D. Mass. 2020) .................................................. 31

*Berk v. Choy*,
145 S. Ct. 546 (U.S. 2026) ................................................................ 28

*Block v. Hirsh*,
256 U.S. 135 (1921) ................................................................. 29, 30

*Bordelon v. Baldwin Cty.*,
2022 U.S. Dist. LEXIS 196442 (S.D. Ala. Oct. 28, 2022),
*aff'd*, 2024 U.S. App. LEXIS 1819 (11th Cir.), *cert. denied*,
145 S. Ct. 171 (U.S. 2024) .............................................................. 26

*Bridge Aina Le'a, LLC v. State Land Use Comm'n*,
950 F.3d 610 (9th Cir. 2020) ................................................. 16, 24, 25

*Capitol Hill Baptist Church v. Bowser*,
496 F. Supp. 3d 284 (D.D.C. 2020) .................................................... 38

*Cedar Point Nursery v. Hassid*,
594 U.S. 139 (2021) ............................................................... *passim*

*Clay Cty. v. Bogue*,
988 S.W.2d 102 (Mo. Ct. App. 1999) .................................................. 25

*Coates v. Hall*,
512 F. Supp. 2d 770 (W.D. Tex. 2007) ................................................ 32

*Colony Cove Props., Ltd. Liab. Co. v. City of Carson,*
888 F.3d 445 (9th Cir. 2018) ............................................................. 23

*Cwynar v. City,*
90 Cal. App. 4th 637 (2001) ........................................................ 12, 17

*Darby Dev. Co., Inc. v. United States,*
112 F.4th 1017 (Fed. Cir. 2024), *reh'g en banc denied,*
2025 U.S. App. LEXIS 13907 (Fed. Cir. June 6, 2025) .............. *passim*

*Davidson v. Quinn,*
138 Cal. App. 3d Supp. 9 (Santa Clara Super. Ct. 1982) .................. 19

*DW Aina Le'a Dev., LLC v. Land Use Comm'n,*
2022 U.S. Dist. LEXIS 93652 (D. Haw. May 25, 2022) ..................... 24

*Faitoute Iron & Steel Co. v. City of Asbury Park,*
316 U.S. 502 (1942) ........................................................................... 35

*FCC v. Florida Power Corp.,*
480 U.S. 245 (1987) ........................................................................... 17

*Greater Chautauqua Fed. Credit Union v. Marks,*
2023 U.S. Dist. LEXIS 57087 (S.D.N.Y. Mar. 31, 2023) ............. 26, 27

*Greater Chautauqua Fed. Credit Union v. Quattrone,*
2025 LX 494630 (S.D.N.Y. Sep. 26, 2025) ........................................ 27

*Guggenheim v. City of Goleta,*
638 F.3d 1111 (9th Cir. 2010) (*en banc*) ........................................... 29

*Heights Apartments, LLC v. Walz,*
30 F.4th 720 (8th Cir.), *reh'g en banc denied,* 39 F.4th 479
(8th Cir. 2022) ............................................................................. *passim*

*Hodel v. Irving,*
481 U.S. 704 (1987) ..................................................................... 27, 28

*Home Building & Loan Association v. Blaisdell,*
290 U.S. 398 (1934) ................................................... 29, 30, 37, 42

5

*Horne v. Dep't of Agric.,*
   576 U.S. 351 (2015)................................................................ 12

*Lee v. Baca,*
   73 Cal. App. 4th 1116 (1999) ........................................................20

*Loretto v. Teleprompter Manhattan CATV Corp.,*
   458 U.S. 419 (1982)...................................................... 9, 12, 13, 33

*Manufactured Home Cmtys., Inc. v. City of San Jose,*
   420 F.3d 1022 (9th Cir. 2005).........................................................30

*Pierson v. Holly Sugar Corp.,*
   107 Cal. App. 2d 298 (1951)........................................................ 18

*Roseberry v. Edward F. Niehaus & Co.,*
   166 Cal. 481 (1913) ................................................................ 18

*Spinks v. Equity Residential Briarwood Apartments,*
   171 Cal. App. 4th 1004 (2009) .........................................................19

*Sveen v. Melin,*
   584 U.S. 811 (2018)................................................................34

*Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency,*
   535 U.S. 302 (2002)...................................................... 33, 34

*Turnacliff v. Westly,*
   546 F.3d 1113 (9th Cir. 2008).........................................................17

*United States Tr. Co. v. New Jersey,*
   431 U.S. 1 (1977)...................................................... 36, 40

*United States v. 50 Acres of Land,*
   469 U.S. 24 (1984)................................................................27

*United States v. Va. Elec. & Power Co.,*
   365 U.S. 624 (1961)................................................................25

*Valnes v. Santa Monica Rent Control Bd.,*
   221 Cal. App. 3d 1116 (1990)........................................................ 12

*W. B. Worthen Co. v. Kavanaugh,*
  295 U.S. 56 (1935) ....................................................... 29, 36, 37

*W. Union Tel. Co. v. Hansen & Rowland Corp.,*
  166 F.2d 258 (9th Cir. 1948) ........................................... 19

*Wheeler v. Pleasant Grove,*
  833 F.2d 267 (11th Cir. 1987) ....................................... 25, 26

*Winchester Mgmt. Corp. v. Staten,*
  361 A.2d 187 (D.C. 1976) ................................................ 16

*Yee v. City of Escondido,*
  503 U.S. 519 (1992) ................................................. *passim*

**Other Authorities**

5 Witkin, SUMM. OF CAL. LAW (10th ed. 2005), *Torts*, § 421 ................... 19

12 Witkin, SUMM. OF CAL. LAW (11th ed. 2017), *Real Prop.*, §
  532 ........................................................................ 18

Alameda County Board of Supervisors Reso. No. R-2020-91 ................. 21

Alameda County Code of Ordinances ("ACCO") .................. 10, 11, 21, 41

      § 6.120.030 ...................................................... 10, 21

      § 6.120.030(F) .................................................. 11, 41

      § 6.120.040 .......................................................... 11

      § 6.120.090(B) ...................................................... 21

      § 6.120.090(D) ...................................................... 21

Fed. R. Civ. Proc. 8 ..................................................... 28

## **INTRODUCTION**

For *three years*—from March 2020 to April 2023—Alameda County imposed a near-total ban on evictions within the County, for virtually any reason. Originally adopted in response to the COVID-19 pandemic, "the County's COVID-19 Moratorium was one of the longest-running in the Nation, and one of the most restrictive." (2-PER-097.) The federal eviction moratorium was ended by the Supreme Court in August *2021*, and California's more tailored tenant-protection laws largely phased out the following month. By then, vaccinations were widely available, "shelter-in-place" was no longer the order of the day, and schools and other businesses had long-since been allowed to operate virtually without restriction. Yet the County continued to use the pandemic as a pretext to maintain its sweeping, draconian eviction ban for 18 additional months.

For three years the County forced Plaintiffs to dedicate their property to the accomplishment of the County's purposes, largely at their own expense. Whatever the justification for doing so in the early months of the pandemic, by the time this case was filed it had dissipated. Under the circumstances, the County's extraordinary actions amounted to a physical and/or regulatory taking of Plaintiffs' property and operated as an unconstitutional impairment of contracts. The district court's

dismissal of Plaintiffs' claims was improper, and the County's various contentions to the contrary are without merit. The judgment of dismissal should be reversed and this case remanded for proceedings on the merits of Plaintiffs' claims.

## ARGUMENT

### I. PLAINTIFFS ADEQUATELY ALLEGED A PHYSICAL TAKING.

#### A. The Moratorium Deprived Plaintiffs of the Rights to Possess, Use, and Dispose of Their Property for Three Years.

"Property rights in a physical thing have been described as the rights 'to possess, use and dispose of it.'" *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982) (quoting *United States v. General Motors Corp.*, 323 U.S. 373, 378 (1945)). The right to "possess" encompasses the right to exclude others. *Id.* A physical taking "effectively destroys *each* of these rights." *Id.*

Regarding "possession," for three years the County's Moratorium granted third parties the right to *physically* occupy Plaintiffs' properties, even when those third parties would otherwise have had no right to do so because they defaulted on rent, damaged the property, or otherwise materially breached their lease. "[P]reventing [owners] from evicting

9

tenants who breach their leases intrudes on one of the most fundamental elements of property ownership—the right to exclude." *Ala. Ass'n of Realtors v. HHS, 594 U.S. 758, 765 (2021)* ("*Alabama Realtors*"). Moreover, the Moratorium precluded Plaintiffs from recovering their properties for their own possessory use. In other words, "the owner ha[d] no right to possess the occupied space himself, and also ha[d] no power to exclude the occupier from possession and use of the space." *Id.* The right to "possess" was taken from Plaintiffs.

To blunt the obvious force of this point, the County repeatedly trumpets the fact that the district court held (in November 2022, two-and-a-half years after the Moratorium was adopted) that Plaintiffs could have obtained possession by pursuing evictions under California's Ellis Act. Yet, the ordinance's text strongly suggests otherwise.[1] On its face, the Moratorium consisted of two pieces: a "general moratorium," applicable to all tenants in the County, ACCO § 6.120.030, and an "enhanced" moratorium conferring additional protections to tenants facing possible evictions "resulting from a substantial loss of income,

---

[1] In the district court Plaintiffs disputed the County's self-serving argument that the Ellis Act exception applied throughout, but those arguments are not renewed here because the court's (mistaken) interpretation effectively gave Plaintiffs the prospective relief they sought on their Fifth Cause of Action.

10

substantial out-of-pocket medical expenses, or extraordinary child care needs, any of which are caused by COVID-19." ACCO § 6.120.040. The general moratorium was subject to three narrow exceptions: for Ellis Act evictions, evictions pursuant to government order, or evictions where "the resident pos[ing] an imminent threat to health or safety." ACCO § 6.120.030(F). The enhanced moratorium was not subject to any exceptions. Judicially noticeable documents show that the County was telling the public the exceptions didn't apply right up until the district court ruled otherwise, proclaiming:

> [I]f you provide documentation that you have a COVID-related impact that made you unable to pay rent on time, the ordinance prohibits your eviction and *there are no exceptions*. If you do not provide documentation or are being evicted for any reason besides nonpayment of rent, there are three exceptions to the eviction ordinance [including the Ellis Act].

(2-PER-169; emphasis added.)

The FAC also alleges "the Alameda County Superior Court consequently refused to take action on unlawful detainer complaints seeking to evict tenants on the basis of the Ellis Act, when those tenants claimed financial hardship." (2-PER-090; *see also* 2-PER-108 & 112.) In other words, for 30 months, due to the County's own actions, the supposed "right" to pursue Ellis Act evictions was unenforceable against many

11

tenants. Furthermore, not all Plaintiffs could avail themselves of the Ellis Act even after the 2022 ruling.[2]

Most importantly, though, the Supreme Court has "rejected the argument that [a] law was not a taking because a landlord could avoid the requirement by ceasing to be a landlord." *Horne v. Dep't of Agric.*, 576 U.S. 351, 365 (2015); *see also Cwynar v. City*, 90 Cal. App. 4th 637, 658 (2001) (ability to evict under Ellis Act did not defeat takings claim).

As for *non*possessory "use," as the County conceded below (ECF #32, p. 23), "The landlord's use of leased property is [that] she exchanges possession for rent." For three years, Plaintiffs were deprived of that "use" of their properties also.

Finally, for those three years the Moratorium undermined Plaintiffs' ability to "dispose of" their property. They retained the "bare legal right" to sell, *Loretto*, 458 U.S. at 435, but buyers had no interest in properties occupied by someone who wouldn't pay rent and couldn't be removed. (1-PER-389, ¶ 46; 2-PER-102.)

In sum, the Moratorium "d[id] not simply take a single 'strand' from the 'bundle' of property rights: it chop[ped] through the bundle, taking a

---

[2] *Valnes v. Santa Monica Rent Control Bd.*, 221 Cal. App. 3d 1116 (1990) (Ellis Act not applicable to condominiums).

slice of every strand," which is the hallmark of a physical taking, *id.* at 434-35.

### B. *Yee v. City of Escondido* Does Not Support the District Court's Dismissal.

It cannot be disputed that in any other context the government's conferral of a right of exclusive access to Plaintiffs' property to a third party—even on a temporary basis—would be a physical taking. *See Cedar Point Nursery v. Hassid,* 594 U.S. 139, 150 (2021) ("*Cedar Point*").

The County's defense to this conclusion primarily boils down to one simple premise: because Plaintiffs initially "invited" tenants into their units the tenants are not "strangers," so under *Yee v. City of Escondido,* 503 U.S. 519 (1992), the requisite compulsion for a physical taking is absent. However, as both the Eighth Circuit and Federal Circuit held in similar cases, "*Yee* … is distinguishable and does not control here." *Darby Dev. Co., Inc. v. United States,* 112 F.4th 1017, 1035 (Fed. Cir. 2024) ("*Darby*"), *reh'g en banc denied,* 2025 U.S. App. LEXIS 13907 (Fed. Cir. June 6, 2025); *Heights Apartments, LLC v. Walz,* 30 F.4th 720, 733 (8th Cir.) ("*Walz*"), *reh'g en banc denied,* 39 F.4th 479 (8th Cir. 2022).

The County's heavy appeal to contrary authority (*see* Appellees' Br., pp. 27-34) is overblown. To the extent other courts have accepted the

13

County's position, they extend *Yee* far beyond its actual holding and artificially cabin *Cedar Point*. Moreover, most of the cases the County relies upon are district court cases, and many predated *Cedar Point* and *Alabama Realtors*. When it comes to appellate authority, though three panels of this Court have adopted the County's position vis-à-vis *Yee* and *Cedar Point,* they did so in unpublished memoranda, and the weight of appellate authority is to the contrary. The other two circuits to decide the issue—in published precedents—agreed with Plaintiffs' position.

### 1. *Yee* was a fundamentally different case.

Fundamentally, the fact is that the Moratorium was qualitatively different from the law challenged in *Yee*. Contrary to the County's milquetoast description of the Moratorium as merely a "temporary adjustment to the terms" the "commercial relationship" between Plaintiffs and their breaching tenants (*see* Appellees' Br. at 11), the Moratorium was "hardly a run-of-the-mill law implicating the landlord-tenant relationship." *Darby, 112 F.4th at 1036*. For three years, it imposed an unprecedented obligation on Plaintiffs to house third parties for free, or to allow those parties to remain on the property even though they severely damaged it.

14

*Yee*, by contrast, addressed "run-of-the-mill" rent control. Rents were limited, but tenants still were required to pay rent or face eviction; landlords could evict for violations of the law or park rules; and they retained the right to cease renting altogether in as little as one year, as opposed to being forced to yield their property indefinitely. 503 U.S. at 527-28. As the Federal Circuit put it, in *Yee* the Court "simply was not presented with something akin to what has been challenged here: an outright prohibition on evictions for nonpayment of rent" or for damage to the property or other material breaches of the lease. *Darby*, 112 F.4th at 1035.

The County objects that, contrary to the *Darby*'s characterization of *Yee* as "fundamentally a rent control case," evictions *were* limited by state law, and it argues that *Darby* and *Walz* are wrong because they mistakenly thought otherwise. (Appellees' Br. at 35.) But *Darby* and *Walz* were not mistaken. *Yee* itself noted, "Strictly speaking, the Escondido rent control ordinance only limit[ed] rents," 503 U.S. at 531 n.*, and this fact isn't just a technicality. It's important because it highlights how narrow the *Yee* plaintiffs' claim was.

True, California law (as opposed to the challenged ordinance) restricted the grounds for eviction, but the *Yee* plaintiffs *did not challenge*

15

*those restrictions. Id*. As the Court understood their argument, the owners only contended that the rent-control system undermined their ability to influence the tenant's choice of whom to sell their mobilehome to, by depriving park owners of the power to threaten a rent increase for a disfavored purchaser. *Id*. It is in that remarkably limited context that *Yee* held the challenged ordinance "merely regulate[d] petitioners' *use* of their land by regulating the relationship between landlord and tenant." *Id*. at 528.

The County contends its Moratorium likewise regulated the "use" of Plaintiffs' property, but, again, a property-owner "uses" property by (1) possessing it or (2) exchanging possession for rent. The County prohibited Plaintiffs from doing either. Thus, the Moratorium didn't merely regulate Plaintiffs' "use" of property; it fundamentally deprived them of that use altogether for three years and destroyed the "essence" of the landlord-tenant relationship—the exchange of possession for rent. *Winchester Mgmt. Corp. v. Staten*, 361 A.2d 187, 190 n.7 (D.C. 1976). The Moratorium effectively converted a bilateral lease into a unilateral "servitude or an easement" on behalf of the breaching tenant. *Cedar Point*, 594 U.S. at 150.

16

> ### 2. *Yee* did not hold that an initial invitation forever after bars a takings claim, despite changed circumstances.

Another fundamental flaw in the County's position is the premise that *Yee* means once a tenant is "invited" to occupy a rental unit, no subsequent change in circumstances can undermine the "voluntariness" of the landlord-tenant relationship for purposes of a physical takings. That proposition contradicts long-standing "background principles" of state law that define "property" for purposes of takings analysis,[3] and it is also contrary *Yee* itself.

*Yee* "*did not* hold or intimate that government coercion is relevant only if it corresponds to the initial physical occupation of the premises." *Cwynar*, 90 Cal. App. 4th at 658 (italics in original). In fact, *Yee* expressly observed that even if a landlord initially chose to rent the property, a physical taking might nevertheless arise "were the statute, on its face or as applied, to compel a landowner over objection to rent his property *or to refrain* in perpetuity *from terminating a tenancy*." 503 U.S. at 528 (emphasis added). For that proposition it cited *FCC v. Florida Power Corp.*, 480 U.S. 245, 251-53 & n.6 (1987), in which the Court rejected a takings challenge to an FCC regulation limiting the rent a utility could

---

[3] *See Turnacliff v. Westly*, 546 F.3d 1113, 1119 n.3 (9th Cir. 2008).

17

charge a cable company to rent space on a utility pole, but which acknowledged the potential constitutional problem if the regulation were interpreted to compel "utilities, over objection, to enter into, renew, *or refrain from terminating* pole attachment agreements" (emphasis added)). The language of these cases is flatly inconsistent with the County's position that an initial "invitation" forever after precludes a physical taking.

The City's position also conflicts with basic common law principles or property law, under which a person who enters another's property as an invitee nevertheless becomes a mere trespasser if the invitee "unnecessarily remains upon the premises of another," *Roseberry v. Edward F. Niehaus & Co.*, 166 Cal. 481, 484 (1913), or exceeds "the circumstances and conditions of his invitation," *Pierson v. Holly Sugar Corp.*, 107 Cal. App. 2d 298, 302-03 (1951). Thus, California has long held that tenants who retain possession when no longer entitled to under the lease are "trespassers." *See* 12 Witkin, SUMM. OF CAL. LAW (11th ed. 2017), *Real Prop.*, § 532 (citing cases). In other words, an "invitation" is contingent upon the conditions of the invitation—in this case, upon the payment of rent and compliance with lease covenants—and can be extinguished by violation of those conditions. *Id*.

18

The County retorts that "[u]nlike trespassers, a tenant, even one in breach, has a continuing interest in the leasehold unless a court rules otherwise." (Appellees' Br. at 36.) Yet no case the County cites in support of that proposition (*id.* at 36-37) disputes the rule that a breaching tenant becomes a trespasser rather than an invitee.

*Spinks v. Equity Residential Briarwood Apartments*, 171 Cal. App. 4th 1004 (2009), and *W. Union Tel. Co. v. Hansen & Rowland Corp.*, 166 F.2d 258 (9th Cir. 1948), acknowledge they *are* trespassers. Those cases merely stand for the unremarkable proposition that, as *Spinks* said, "[r]esort to legal process is required, even where the occupant 'is technically a trespasser.'" 171 Cal. App. 4th at 1038 (quoting 5 Witkin, SUMM. OF CAL. LAW (10th ed. 2005), *Torts*, § 421, p. 636). Landlords cannot resort to "self-help" to remove the trespasser, as they could under the common law. But it doesn't follow that the breaching tenant is any less a trespasser—the *Spinks* rule applies "*[r]egardless of who has the right to possession*," simply because the state has an interest in "orderly procedure and preservation of the peace…" *Id.* at 1050 (emphasis added); *see also id.* at 1038. Similarly, *Davidson v. Quinn*, 138 Cal. App. 3d Supp. 9 (Santa Clara Super. Ct. 1982), held that a tenant's breach didn't excuse

19

a landlord from complying with the unlawful detainer statute's notice procedures when seeking to remove a breaching tenant.

*Lee v. Baca*, 73 Cal. App. 4th 1116 (1999), is even further afield. It held federal bankruptcy laws did not preempt a landlord's ability to reclaim property from a breaching tenant pursuant to an unlawful detainer judgment, but it didn't address the holdover tenant's rights or status prior to judgment.

"If a previous voluntary invitation (by itself) controlled the analysis, that would essentially mean that *all* government actions implicating the landlord-tenant relationship are immune from being treated as physical takings." *Darby*, 112 F.4th at 1036. But "just because tenants (or other occupiers of property) were at one point 'invited' does not mean that their continued, government-compelled occupation cannot, under any circumstances, be treated as a physical taking." *Id.*

### C. That the Moratorium Was "Temporary" Does Not Mean There Was No Taking.

The County also emphasizes repeatedly that the Moratorium was "temporary," and it stresses the fact that *Yee* talked about an obligation to rent a unit "in perpetuity" as raising a constitutional problem. (*See, e.g.,* Appellees' Br. at 34.) However, it bears remembering that the

20

"temporary" duration of the Moratorium was entirely theoretical when this case was filed. It was more accurately characterized as "indefinite." The Moratorium ordinance stated it would terminate sixty days "after the expiration of the local health emergency," ACCO § 6.120.030, and the County Board declared the emergency would persist "until the [Board] determines that the emergency no longer exists." Reso. No. R-2020-91 (3-PER-347). In other words, like any other statute or ordinance, it was "temporary" only in the sense that it would be in force until the legislative body voted to repeal it. As late as July 2022 the Board still rejected proposals to even discuss the possibility of loosening the Moratorium, much less repealing it. (*See* ECF #28, Exs. 19-21.)

It is also worth reiterating that *even today* parts of the Moratorium remain in effect and prohibit evictions. Tenants who missed rent payments during the three-year "emergency" still cannot be evicted based on that default. ACCO § 6.120.090(B) & (D). If they resumed payments in April 2023, tenants could forego payment of the prior three years' rent without practical consequence.

Most importantly, though, *Cedar Point* clarified that compensation for a physical occupation is due regardless of whether the invasion is permanent or temporary. "The duration of an appropriation—just like

21

the size of an appropriation [citation]—bears only on the amount of compensation." 594 U.S. at 153-54. True, an occasional or "isolated" physical invasion may be a tort rather than a taking, or it may be authorized by long-standing property law principles like rules of necessity, *id.* at 159-60, but a three-year-long, continuous occupation is hardly occasional or isolated. *See id.* at 152 (finding a taking where union organizers were given access three hours a day, 120 days a year).

Indeed, in *Darby* the Government advanced this precise argument—that the CDC's eviction moratorium "did not prevent evictions *in perpetuity*"—and the Federal Circuit squarely rejected it, relying on *Cedar Point*. 112 F.4th at 1036 (italics in original).

### D. Finding a Taking in This Case Would Not "Imperil Legitimate Rent Control."

Finally, battling a straw man of its own invention—that Plaintiffs argue they have an "unlimited" right to evict—the County hyperbolically asserts that, if this Court rules in Plaintiffs' favor all rent control laws would be endangered. This, too, parrots an argument advanced by the Government in *Darby*, and it, too, was rejected by the Federal Circuit as "misplaced." 112 F.4th at 1036-37. That Court recognized the CDC's eviction moratorium was "a highly unusual—and, so far as the parties

22

have shown, unprecedented—Order that outright prevented evictions for nonpayment of rent," distinguishing it from "a run-of-the-mill law implicating the landlord-tenant relationship." *Id.* The same is true here.

## II.  PLAINTIFFS ALSO ADEQUATELY ALLEGED A TEMPORARY REGULATORY TAKINGS.

### A.  Plaintiffs Adequately Alleged Severe Economic Impact.

There are numerous flaws with the County's assertion that Plaintiffs failed to adequately allege severe economic impacts.

First, the County is wrong that lost rental income cannot demonstrate severe economic impact and the focus must be exclusively on lost equity value. The chief case the County cites for this proposition— *Colony Cove Props., Ltd. Liab. Co. v. City of Carson*, 888 F.3d 445 (9th Cir. 2018)—was a typical rent control case in which landlords challenged their ongoing inability to collect some *portion* of rent that they otherwise could earn. In those circumstances, the Court held that lost rental income, *while relevant*, would not constitute a taking unless the loss also resulted in a severe reduction of the property's equity value.

However, under this Court's case law a "modified" standard applies to a *temporary* taking:

23

> In a temporary regulatory taking case, just compensation damages are modified because 'the landowner's loss takes the form of an injury to the property's potential for producing income or an expected profit,' not the loss of the property itself." [Citation.] In these circumstances, '[t]he landowner's compensable interest . . . is the return on the portion of fair market value that is lost as a result of the regulatory restriction. Accordingly, the landowner should be awarded the market rate return computed over the period of the temporary taking on the difference between the property's fair market value without the regulatory restriction and its fair market value with the restriction."

*Bridge Aina Le'a, LLC v. State Land Use Comm'n*, 950 F.3d 610, 632 n.12 (9th Cir. 2020) (quoting *Wheeler v. Pleasant Grove*, 833 F.2d 267, 271 (11th Cir. 1987)).

Or, as the district court in *Bridge* summarized on remand, "In a case that … involves a temporary regulatory taking, the property interest that is 'taken' is the owner's right to use the property to produce income or an expected profit." *DW Aina Le'a Dev., LLC v. Land Use Comm'n,* 2022 U.S. Dist. LEXIS 93652, at *2 (D. Haw. May 25, 2022), *rev'd on standing grounds*, 2023 U.S. App. LEXIS 18309 (9th Cir. July 19, 2023).

The County's response is two-fold. First, it asserts *Bridge* was about "damages" for a taking, not the standard for determining if a taking occurred. (Appellees' Br. at 43.) This is an artificial distinction, and the County cites no authority that supports it. "Determining liability and

24

damages for a taking involves one legal theory," and they are "closely connected…" *Clay Cty. v. Bogue*, 988 S.W.2d 102, 110 (Mo. Ct. App. 1999). The measure of just compensation damages is the value of the interest taken. *See United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 633 (1961).

Second, the County asserts *Bridge* only considered equity values, not income. However, that case addressed the claimed temporary taking of undeveloped land for which there was no possible income during the relevant period, so the only harm alleged was reduction in value. That doesn't change the fact that *Bridge* held lost income is a proper measure of a temporary regulatory taking.

*Wheeler v. Pleasant Grove*, which *Bridge* cited for that proposition, exemplifies the proper rule. In *Wheeler*, a city temporarily—and unconstitutionally—barred a property-owner from building and leasing an apartment complex. The district court nevertheless held the plaintiffs had "suffered no compensable loss because the property's value after the lifting of the regulatory restriction was greater than its value before the restriction came into effect." 833 F.2d at 271. The Eleventh Circuit reversed because "[t]he district court's analysis fail[ed] to account for … the loss in income-producing potential suffered over the sixteen months

25

[the ordinance] was in effect." *Id*. *See also* *Bordelon v. Baldwin Cty.*, 2022 U.S. Dist. LEXIS 196442 (S.D. Ala. Oct. 28, 2022), *aff'd*, 2024 U.S. App. LEXIS 1819 (11th Cir.), *cert. denied*, 145 S. Ct. 171 (U.S. 2024) (finding temporary taking where plaintiff lost $600,000 of rental income, amounting to 19% of the property's equity value but 100% of the expected rent during the period the government delayed construction).

In this case, during the Moratorium's three-year existence Plaintiffs' losses vastly exceeded 50% of the rental income they were entitled to, and in some cases reached 100%.

Regardless, there is also no merit to the County's contention that that failure to allege a diminution of at least 50% is "fatal" to Plaintiffs' claim. Though this Court has previously observed that it knew of no case finding a regulatory taking with less than 50% diminution, none of the cases the County cites gave this one factor dispositive power, such that they ignored the other *Penn Central* factors. Doing so would run counter to the Supreme Court's admonition to avoid applying "per se" rules with respect to regulatory takings claims, rather than balancing all the relevant factors.

*Greater Chautauqua Fed. Credit Union v. Marks*, 2023 U.S. Dist. LEXIS 57087 (S.D.N.Y. Mar. 31, 2023), is instructive. In that case, credit

unions challenged a law reducing the post-judgment interest rate on consumer debts from 9% to 2%, insofar as it applied retroactively to past judgments. The parties disagreed as to the amount of diminution. The plaintiffs alleged it was 80%; the State responded it was only 30%. The district court held that "even assuming" the State's figure was correct, "that conclusion d[id] not (at least in th[at] case) outweigh the other factors," and it denied the State's motion to dismiss. *Id.* at *27-28, Appeal No. 23-733 (2d Cir.) dismissed 10/9/24.[4]

Moreover, it's not true that a taking has never been found with less than 50% diminution. The County seeks to characterize *Hodel v. Irving, 481 U.S. 704 (1987)*, discussed in Appellants' Opening Brief, as a case in which the government took 100% of each owner's interest at the time of escheat. But the value of a taken interest is judged "at the time of the taking," *United States v. 50 Acres of Land, 469 U.S. 24, 29 (1984)*, and in *Hodel* the Court observed that the value of the interests that would eventually escheat were approximately 32% of the total value at that point. *Id.* at 715. The Court nevertheless found a taking because it viewed

---

[4] After trial the district court denied relief, but only because plaintiffs failed to actually produce sufficient *evidence* to prove their allegations regarding "investment-backed expectations." *Greater Chautauqua Fed. Credit Union v. Quattrone, 2025 LX 494630, at *35 (S.D.N.Y. Sep. 26, 2025)*. In this case, Plaintiffs were denied that opportunity.

the character of the governmental action as "extraordinary," *id.*, just as County's Moratorium was extraordinary.

Finally, the district court imposed an unduly burdensome pleading standard on Plaintiffs to establish severe economic impact, requiring precise calculations of harm of the sort that would typically be the subject of expert testimony. *Berk v. Choy*, 145 S. Ct. 546 (U.S. 2026), is instructive. In *Berk*, the Court recently held Rule 8 bars the application in federal court of a Delaware requirement that plaintiffs in medical malpractice actions attach an affidavit to their complaint, signed by an medical professional, attesting to the suit's merit. The Court observed that it had "consistently rejected" efforts by lower courts to "require more information for certain kinds of claims" than the "short and plain statement of the claim" required by Rule 8.

### B. Plaintiffs Adequately Alleged Interference with Their Reasonable, Investment-Backed Expectations.

Next, regarding the County's argument that the Moratorium didn't interfere with Plaintiffs' reasonable, investment-backed expectations: This Court has recognized, even though rental housing is a regulated industry, that "expecting rent to be paid" *is* a reasonable expectation.

28

*Guggenheim v. City of Goleta*, 638 F.3d 1111, 1120 (9th Cir. 2010) (*en banc*), and no previous regulation of rental housing could have led landlords to expect they would lose all the benefits of their agreements for three years while retaining all the duties.

The City asserts "the Moratorium resembles other emergency housing regulations which the Supreme Court has found constitutional," citing *Block v. Hirsh*, 256 U.S. 135 (1921), and *Home Building & Loan Association v. Blaisdell*, 290 U.S. 398 (1934) ("*Blaisdell*"). (Appellees' Br. at 56.) But while *Block* approved capping rents for a limited time, to address a housing shortage during World War I, tenants still had to pay "a reasonable rent." 256 U.S. at 154 & 157. Likewise, in *Blaisdell*, mortgagors were temporarily protected from foreclosure only if they "pa[id] all or a reasonable part of such income or rental value, in or toward the payment of taxes, insurance, interest, mortgage" as a court directed. 290 U.S. at 416-17. In neither case were owners forced to house residents rent-free.

In light of *W. B. Worthen Co. v. Kavanaugh*, 295 U.S. 56 (1935), which invalidated a foreclosure moratorium in part because "[r]elief [wa]s not conditioned upon payment of interest and taxes or the rental value of the premises," *id.* at 61, coupled with the general understanding

29

that the Constitution guarantees landlords the right to charge enough rent to obtain a "fair return" on investment,[5] nothing in *Block, Blaisdell*, or any case could have alerted landlords that their right to evict for complete nonpayment of rent would be nullified for three years. *Walz*, 30 F.4th at 730.

The County also argues it didn't interfere with Plaintiffs' reasonable expectations because (1) the Moratorium purportedly didn't relieve tenants of the obligation to pay rent—landlords could always sue tenants for back-rent as consumer debt (after waiting a year); (2) the Moratorium "included an express exception for 'imminent threat[s] to health or safety'"; and (3) the Moratorium "also *likely* still permitted evictions in some circumstances involving property destruction to prevent serious risks to CAA." (Appellees' Br. at 50, emphasis added.)

Regarding the first point, numerous courts have recognized the worthlessness of the "sue for back-rent" remedy. In *Walz* the Eighth Circuit observed, "While landlords may bring an action against delinquent tenants for past-due rent, monetary relief obtained against a judgment-proof individual is an illusory remedy." 30 F.4th at 729 n.7.

---

[5] *See Manufactured Home Cmtys., Inc. v. City of San Jose*, 420 F.3d 1022, 1028 (9th Cir. 2005).

Likewise, in *Baptiste v. Kennealy*, 490 F. Supp. 3d 353 (D. Mass. 2020), the court addressed identical defenses of Massachusetts' six-month moratorium and concluded, "this right [to seek back-rent] is largely illusory, as tenants who have not paid their rent for many months because of economic distress—or, indeed, for any other reason—are unlikely to pay a money judgment against them." *Id.* at 376. And in *Alabama Realtors*, the Supreme Court recognized the CDC moratorium put "millions of landlords across the country[] at risk of irreparable harm by depriving them of rent payments with no guarantee of eventual recovery." 594 U.S. at 765. The actual experience of Plaintiffs confirms these predictions. (2-PER-105-06.)

The second point is simply misleading. As discussed above, *see* Section I.A, the "threats to health and safety" exception didn't apply to all properties. Only tenants who didn't claim COVID-19 hardship could be evicted on that basis.

Finally, the fact the County points to no actual provision of the Moratorium that permitted evictions for property damage, coupled with its equivocal hedging ("likely permitted"), exposes the obvious fallacy of the third argument.

### C. The Character of the Moratorium Also Supports the Conclusion It Effected a Regulatory Taking.

With respect to the character of the government action, the County argues the Moratorium merely "adjusted the benefits and burdens of economic life," like any rent control or just-cause eviction law. And here again, the County resumes its argument that Plaintiffs were "merely" deprived of their right to evict but retained other remedies like suing for back-rent.

The inadequacy of "alternative" remedies is discussed above, as is the deficiency of the premise that the Moratorium was just like any other "run-of-the-mill" rent control or just-cause eviction law. As a matter of facts on the ground—and allegations in the complaint—the Moratorium was "a highly unusual—and … unprecedented—Order that outright prevented evictions for nonpayment of rent," *Darby*, 112 F.4th at 1036-37. It functioned "'too much *like* a physical taking,'"[6] even if one accepts the (flawed) proposition that it wasn't an actual physical taking.

For three years Plaintiffs lost control of their properties. They lost the rights to occupy the space themselves and exclude others; to "control

---

[6] *Coates v. Hall*, 512 F. Supp. 2d 770, 786 n.8 (W.D. Tex. 2007) (quoting *Sheffield Dev. Co. v. City of Glenn Heights*, 140 S.W.3d 660, 671 (Tex. 2004)).

the use of the property" and obtain a "profit" from it; and even, practically-speaking, sell it. *Loretto*, 458 U.S. at 435. The only things left were their obligations to maintain and pay for the property.

### D. The Moratorium's Extraordinary Duration Cannot Be Disregarded.

Finally, the County would have this Court discount the extraordinary length of the Moratorium in its calculus because (the County asserts) doing otherwise is merely "double-counting" on the economic-impact factor. (Appellees' Br. at 52.) Yet the County cannot deny that the Supreme Court has held that when, as here, the deprivation of use was temporary, "the duration of the restriction is one of the important factors that a court must consider in the appraisal of a regulatory takings claim," *Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 342 (2002). It is also logically relevant to all the traditional *Penn Central* considerations—economic impact, reasonable expectations, *and* character of the action. The County's argument to the contrary suffers from the defect the Court warned about in *Tahoe-Sierra*: a temptation to treat each *Penn Central* factor in isolation—to adopt a "set formula for determining how far is too far"—

33

rather than engage in the holistic, "'essentially ad hoc, factual inquiries'" prescribed by *Penn Central. Id.* at 326.

### III.    PLAINTIFFS ADEQUATELY ALLEGED UNCONSTITUTIONAL IMPAIRMENT OF LEASE OBLIGATIONS.

####    A.    *Of Course*, the Moratorium Substantially—Indeed, Severely—Impaired Lease Agreements.

The "threshold issue" courts must address in applying the Contracts Clause is whether the challenged law "operated as a substantial impairment of a contractual relationship." *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 244 (1978). "In answering that question, the [Supreme] Court has considered the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen v. Melin,* 584 U.S. 811, 819 (2018). The Moratorium did all three.

The first and third prongs go hand-in-glove in this case. Again, the County argues it didn't undermine the contractual bargain or prevent landlords from safeguarding or reinstating their rights, because "the Moratorium explicitly maintained tenants' obligation to pay rent," and

34

landlords could always file suit against tenants to obtain back-rent as consumer debt or damages for injury to the property. (*Id.* at 54-57.)

Yet, because "[t]he Constitution is 'intended to preserve practical and substantial rights, not to maintain theories," courts, in assessing whether rights under the Contracts Clause are impaired, must look beyond "paper" rights and remedies to "the realm of actualities and not of abstractions" and "what things are worth in dollars and cents...." *Faitoute Iron & Steel Co. v. City of Asbury Park*, 316 U.S. 502, 514 (1942) (quoting *Davis v. Mills*, 194 U.S. 451, 457 (1904)).

As noted above, many courts have recognized the illusory nature of the back-rent remedy. As a matter of "actualities" and not "abstractions," many Alameda County tenants were freed from having to pay rent because the only non-illusory remedy available to landlords—eviction—was blocked. Plaintiffs' right to collect rent continued to exist on "paper," but not reality.

As for the remaining prong—the notion that the Moratorium didn't interfere with Plaintiffs' reasonable expectations—the speciousness of that argument is addressed in Section II.B above.

The County further argues "it would be exceedingly difficult, if not impossible," to assess an impairment's severity based on the duration of

35

the restriction—to determine what's "too long." (Appellees' Br. at 57-58.) Yet the Supreme Court has expressly held the duration of such a restriction, though not dispositive by itself, *is* among the "factors to be assessed," *United States Tr. Co. v. New Jersey*, 431 U.S. 1, 22 (1977), and whatever line-drawing problems might theoretically arise in other cases, Alameda County's Moratorium persisted so much longer than virtually any other that it's not close to the line. *Cf. Alabama Realtors*, 594 U.S. at 765-66 (agreeing that in August *2021* the interest in combating the spread of COVID-19 was already too attenuated to sustain the CDC's moratorium).

Finally, recognizing the Supreme Court held a foreclosure moratorium to be an unconstitutional impairment in *Worthen*, the County seeks to distinguish that case as being based on the fact that "the mortgagor was 'without an effective remedy' because the mortgagee had no 'enforceable obligation' to pay." (Appellees' Br. at 58.) Summarizing the case at that sky-high level of generality obscures the reasons the Court reached that conclusion: because the bondholders' remedy was sufficiently delayed by changes in the law (*i.e.*, duration), and because the protected mortgagor was not required to pay reasonable rent while

36

the moratorium lasted, to protect the mortgagee's interest—both factors applicable here. 295 U.S. at 63.[7]

## B. The Moratorium Was Not Tailored Appropriately to a Legitimate Purpose.

The County argues that, even if the Moratorium substantially impaired contracts, it was reasonably tailored to a public purpose, and it urges the Court to defer to its judgment. But even under "the modern approach to the Contracts Clause post-*Blaisdell*," Apartment Ass'n of L.A. Cty., Inc. v. City of L.A., 10 F.4th 905, 912 (9th Cir. 2021) ("*AAGLA*"), "judicial deference, even in an emergency or a crisis like the COVID-19 pandemic, 'does not mean wholesale judicial abdication.'" Walz, 30 F.4th at 730. "It is always open to judicial inquiry whether the exigency still exists upon which the continued operation of the law depends." Blaisdell, 290 U.S. at 442.

Furthermore, "The severity of the impairment measures the height of the hurdle the state legislation must clear. Minimal alteration of contractual obligations may end the inquiry at its first stage. Severe

---

[7] The attempt to distinguish *Worthen* on the ground that Louisiana was an "interested party" in the contracts ignores the fact that the suit was not against the state—it was a foreclosure proceeding against property-owners who failed to pay benefit assessments. Id. at 57.

impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the state legislation." *Spannaus*, 438 U.S. at 245. And duration matters. "When a crisis stops being temporary, and as days and weeks turn to months and years, the slack in the leash eventually runs out." *Capitol Hill Baptist Church v. Bowser*, 496 F. Supp. 3d 284, 297 (D.D.C. 2020); *see also* *Walz*, 30 F.4th at 726-27 (as "time is available for more reasoned and less immediate decision-making by public health officials," more critical judicial review warranted).

Alameda County's Moratorium was the most severe in the country in terms of the scope of its prohibitions and invasion of landlords' interests. As discussed in Appellants' Opening Brief, the contrast with California's eviction restrictions is illuminating. The State limited the tenants who were protected from nonpayment-evictions only to those most affected by the financial effects of the pandemic. The County gave all tenants a free pass. The State required protected tenants to at least make partial payments to avoid eviction. The County didn't. And the State allowed evictions for fault (nuisance, waste, material breach, etc.), and no-fault "just cause" reasons, like owner move-ins. The County prohibited those, too.

38

The County's Moratorium was also one of, if not, the longest-lasting in the country—twice the length of the State's restrictions or the CDC moratorium. Thus, a "careful examination" of the County's proffered justifications, rather than blind deference, is demanded. *Spannaus*, 438 U.S. at 245.

Again, the County proffers three public purposes that it claims justified the three-year maintenance of the Moratorium: "[1] to reduce the transmission of COVID-19, [2] to promote housing stability during the COVID-19 pandemic and [3] to prevent avoidable homelessness."

But the County's assertion that these interests justified a near-blanket *three-year* ban on evictions must be viewed skeptically in view of the fact that virtually no other segment of society was asked to bear a comparable burden. The County reopened businesses and schools in June 2021—almost *two years* before it repealed the eviction moratorium. (3-PER-161-164.) By the time this case was filed, a year before the Moratorium was repealed, large public venues were open, one could visit virtually all those businesses, schools, or venues—or fly on an airplane—without wearing a mask, and the economy had largely rebounded from the initial COVID-19 downturn, as the County admitted (*see* 3-PER-373). The State and federal eviction limits had long-since phased out. Yet the

County persisted in imposing ongoing burdens on landlords that others were not asked to bear.

Even where an important public purpose is identified, the government "is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well." *United States Trust Co.*, 431 U.S. at 31. The County opted for the most drastic impairment possible, surpassing constitutional boundaries.

### C. *AAGLA* Does Not Support the County's Three-Year-Long Maintenance of the Most Stringent Moratorium in the Country.

The County argues that this Court's decision in *AAGLA*, 10 F.4th at 905, compels it to uphold Alameda County's Moratorium too, and, in doing so, it works very hard to obscure the significant differences between Los Angeles's moratorium and the County's.

For example, it asserts, "CAA states that Los Angeles 'only' prohibited evictions for nonpayment of rent attributable to COVID-19. [Citation.] **But, the Moratorium contained the same prohibition** and, unlike in *AAGLA*, required tenants to provide proof of their hardship upon request." (Appellees' Br. at 63, emphasis added.) But the County's

40

oblique phrasing conveniently obscures the fact that the prohibitions in the two moratoria were not, in fact, "the same."

Los Angeles's moratorium "only" protected tenants from eviction who were unable to pay rent due to COVID-19-related financial hardship, whereas *all* tenants in Alameda could decline to pay rent, regardless of their means. As discussed above, under the County's "general" moratorium, tenants could only be evicted based on (1) the Ellis Act, (2) government orders; or (3) "the resident pos[ing] an imminent threat to health or safety," ACCO § 6.120.030(F)—not nonpayment of rent. Under the enhanced portion of the Moratorium, even those exceptions were inapplicable.

Other distinctions abound. As discussed in Appellants' Opening Brief (at page 80), Los Angeles, unlike the County, did not prohibit *for-fault* evictions, such as for material breaches of the lease or damage to the property, even for tenants who suffered a loss of income. And unlike the County, LA didn't *permanently* ban evictions for nonpayment during the emergency period. In short, the County's Moratorium undermined landlords' contractual bargain far more severely even than Los Angeles's.

*AAGLA* also didn't address an extraordinary *three-year* eviction ban. It reviewed a district court decision from November 2020, just

41

months into the pandemic, when businesses were still closed and vaccines months away.

"Every case must be determined upon its own circumstances," *Blaisdell*, 290 U.S. at 430, and *AAGLA* is distinguishable.

## CONCLUSION

The judgment below should be reversed and this case remanded.

Respectfully submitted,

Dated: March 10, 2026      NIELSEN MERKSAMER LLP

By: /s/     Christopher E. Skinnell

*Attorneys for Plaintiffs & Appellants*
CALIFORNIA APARTMENT ASSOCIATION, STEPHEN LIN, RAKESH AND TRIPTI JAIN, ALISON MITCHELL, MICHAEL HAGERTY, AND H. ALEX AND DANNIE ALVAREZ

42

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-6068

I am the attorney or self-represented party.

**This brief contains** 6,999 **words,** including [ ] words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
[ ] it is a joint brief submitted by separately represented parties.
[ ] a party or parties are filing a single brief in response to multiple briefs.
[ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [            ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Christopher E. Skinnell **Date** March 10, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*